[No. 1396. December 8, 1911.]
VALENTINA CHAVES de PADILLA, Etc., Appellee,
v. THE ATCHISON, TOPEKA AND SANTA FE
RAILWAY COMPANY, Appellant.

SYLLABUS.

1. Failure to exercise due care in approaching a railroad crossing amounts to contributory negligence.

2. The burden of showing contributory negligence is on the defendant.

3. There is presumption, in the absence of evidence to the contrary, that person killed in crossing a railroad stopped, looked and listened.

4. Examination of the evidence fails to disclose that deceased was guilty of contributory negligence.

5. Examination of instructions discloses that court in its instructions given both as to the burden of proving contributory negligence and as to the presumption that due care and caution was exercised by deceased in approaching railroad crossing, fully and fairly expressed law applicable.

6. Examination of record discloses that evidence complained of was not admitted for purpose of showing consciousness on part of defendant company of antecedent negligence.

Appeal from the District Court for Valencia County, before M. C. MECHEM, Associate Justice. Affirmed.

R. E. TWITCHELL for Appellant.

It is the duty of a traveler upon a public road, approaching a railway crossing, to approach cautiously and carefully using his faculties of sight and hearing. Pierce on Railroads 343; Wichita etc. R. Co. v. Davis, 37 Kas. 743; Clark v. Mo. Pac. R. Co., 35 Kas. 354; Chicago etc. R. Co. v. Kuster, 22 Ill. App. 188; Hoyt v. New York etc. R. Co., 118 N. Y. 399; International etc. R. Co. v. Dyer, 76 Tex. 156; Tucker v. New York etc. R. Co., 124 N. Y. 308; Penn. R. Co. v. Righter, 42 N. J. L. 180; Lake Shore etc. R. Co. v. Clemens, 5 Ill. App. 75; Illinois etc. R. Co. v. Hetherwytan, 83 Ill. 310; Cincinnati etc. R. Co. v. Butler, 103 Ind. 31; Indiana etc. R. Co. v. Greene, 25 A. & E. Rd. Cases 322; Strong v. Sacramento etc. R. Co., 61 Cal. 326; Miller v. Chicago etc. R. Co., 164 Mo. 180; Maher v. Atlantic etc. R. Co., 64 Mo. 267; Karl v. Kansas City, etc. R. Co., 55 Mo. 484; Hicks v. Mo. Pac. R. Co., 101 Mo. 36; Pa. R. Co. v. Aiken, 18 Atl. Rep. 620; Railroad Co. v. Heilman, 49 Pa. St. 60; Greenwood v. Railroad Co., 124 Pa. St. 572; Weber v. N. Y. R. Co., 58 N. Y. 45; Central of Georgia Ry. Co. v. Barnett, 44 So. Rep. 392; Read v. N. Y. C. & H. R. R. Co., 107 N. Y. S. 1068; Salter v. Utica etc., 75 N. Y. 273; Georgia Pacific R. Co. v. Lee, 92 Ala. 262; Chicago, etc.

R. Co. v. Wilson, 133 Ill. 55; Lang v. Holliday Creek R.
Co., 49 Iowa 469; Clark v. Missouri Pacific Ry. Co., 35
Kas. 350; Wright v. Boston etc. R. Co., 129 Mass. 440;
Cleveland etc. R. C. v. Elliott, 28 Ohio St. 340; Holland
v. Missouri Pacific Ry. Co., 210 Mo. 338; Hook v. Mis-
souri Pacific R. Co., 162 Mo. 569; Hayden v. Missouri
Pacific R. Co., 124 Mo. 566; Damrill v. St. Louis etc. R.
Co., 27 Mo. App. 202; Davis v. New York etc. R. Co., 47
N. Y. 400; Boyd v. Wabash R. Co., 105 Mo. 371; Wil-
liams v. Chicago etc. R. Co., 64 Wis. 1; Straugh v. De-
troit etc. R. Co., 65 Michigan 706; Brooks v. Buffalo
etc. R. Co., 27 Barber, N. Y. 532; Schofield v. Chicago
etc. Rd. Co., 144 U. S. 615; Continental Imp. Co. v.
Stead, 95 U. S. 160; Railroad Co. v. Houston, 95 U. S.
697; Brown v. Milwaukee Ry. Co., 22 Minn. 165; Im-
provement Co. v. Munson, 14 Wall. 442; Pleasants v.
Fant, 22 Wall. 116; Herbert v. Butler, 97 U. S. 319;
Bowditch v. Boston, 101 U. S. 16; Griggs v. Houston,
104 U. S. 553; Randall v. Baltimore & Ohio R. R. Co.,
109 U. S. 478; Anderson County Commrs. v. Beal, 113 U.
S. 227; Bayliss v. Travelers' Insurance Co., 113 U. S.
316; Payne v. Chicago etc. R. Co., 129 Mo. 419; Chicago
etc. R. Co. v. Hedges, 118 Ind. 5; Taylor v. Mo. Pac. R.
Co., 86 Mo. 462; Drake v. Chicago etc. R. Co., 51 Mo.
App. 562; Mann v. Belt Line R. Co., 128 Ind. 138;
Indiana etc. R. Co. v. Hammock, 113 Ind. 1; Pennsyl-
vania R. Co. v. Rothgeb, 32 Ohio St. 66; Chicago etc.
R. Co. v. Lee, 68 Ill. 576; Union Pacific R. Co. v. Adams,
33 Kas. 427; Grows v. Maine etc. R. Co., 67 Me. 100;
Maxey v. Missouri Pacific R. Co., 113 Mo. 1; Stepp v.
Chicago etc. R. Co., 85 Mo. 229; Lenix v. Mo Pac. Ry.
Co., 76 Mo. 86; Caldwell v. Kansas City etc R. Co., 58
Mo. App. 453; Hook v. Mo. Pac. Ry. Co., 162 Mo. 569;
Wengler v. Mo. Pac. Ry. Co., 16 Mo. App. 493; Rodrian
v. New York etc. R. Co., 125 N. Y. 526; Cullen v. Dela-
ware etc. Co., 113 N. Y. 667; Williams v. Chicago etc.
R. Co., 64 Wis. 1; Ormsbee v. Boston etc. R. Co., 14 R.
I. 102; Davey v. London, etc. R. Co., L. R. 11 Q. B.
D. 213; Chicago etc. v. Houston, 95 U. S. 697; Pennsyl-
vania R. Co. v. Righter, 42 N. J. L. 180; Galveston etc.

Padilla v. Railway Co., 16 N. M. 576.

R. Co. v. Kutac, 72 Texas 643; Chicago etc. Ry. Co. v. Wheelbarger, 88 Pac. 531; Southern Ry. Co. v. Jones, 56 S. E. 432; Northern Pac. R. Co. v. Freeman, 174 U. S. 179; Schofield v. Chicago & St. Paul Ry. Co., 114 U. S. 615; Pennsylvania R. Co. v. Mooney, 126 Pa. St. 244; Gothard v. Alabama R. Co., 67 Ala. 118; Pennsylvania R. Co. v. Frana, 112 Ill. 398;: Terre Haute etc. R. Co. v. Voeler, 129 Ill. 540; Fletcher v. Atlantic etc. R. Co., 64 Mo. 484; Masterson v. Chicago etc. R. Co., 58 Mo. App. 572; Russell v. Atchison etc. R. Co., 70 Mo. App. 88; Henze v. St. Louis etc. R. Co., 71 Mo. 636; Stepp v. Chicago etc. R. Co., 85 Mo. 229; Kelly v. Chicago etc. R. Co., 88 Mo. 534; Kelsay v. Missouri Pac. Ry. Co., 129 Mo. 362; Hook v. Missouri Pac. Ry. Co., 162 Mo. 569; Pennsylvania Ry. Co. v. Morel, 40 Ohio St. 338; Beyel v. Newport etc. R. Co., 34 W. Va. 538; McBride v. Northern Pac. R. Co., 19 Oregon 64; Atchison etc. R. Co. v. Townsend, 39 Kas. 115; Cincinnati etc. R. Co. v. Howard, 124 Ind. 280; Nehrbas v. Central Pac. R. Co., 62 Cal. 320; South etc. R. Co. v. Donovan, 84 Ala. 141.

The negligence of plaintiff's intestate was a question of law for the court and the case should have been taken from the jury. Sheffield v. Rochester etc. R. Co., 21 Barb. N. Y. 339; Thompson v. Flint etc. R. Co., 57 Mich. 300; Hackford v. New York etc. R. Co., 53 N. Y. 654; Smith v. New York etc. R. Co., 137 N. Y. 562; Hook v. Mo. Pac. Ry. Co., 162 Mo. 569; Kelsay v. Ry. Co., 129 Mo. 362; Hayden v. Ry. Co., 124 Mo. 566.

Admission of testimony as to changes in physical condition on right of way and locality of accident, was prejudicial to defendant. Terre Haute & I. R. Co. v. Clem, 123 Ind. 18; Menard v. Railroad Co., 150 Mass. 386; Thompson v. R. Co., 91 Mich. 255; Baron v. Reading Iron Co., 51 Atl. 979; Mo. Pac. Rd. Co. v. Hennesy, 12 S. W. 608; Columbia R. Co. v. Hawthorn, 144 U. S. 202.

Instructions should be definite, direct and certain. Cothran v. Moore, 1 Ala. 423; Smith v. Collins, 94 Ala. 394; Todd v. Fambro, 62 Ga. 665; Aiken v. Weckerly, 19 Mich. 482; Hyde v. Shank, 77 Mich. 517; Gilmore v.

McNeil, 45 Me. 599; Crete v. Childs, 11 Neb. 252; Meyer v. Midland Pac. R. Co., 2 Neb. 319; Shaw v. People, 81 Ill. 150; Toledo etc. R. Co. v. Moore, 77 Ill. 217; Volk v. Roche, 70 Ill. 297; Cushman v. Cogswell, 86 Ill. 62; Wabash R. Co. v. Henks, 91 Ill. 406; Singer Mfg. Co. v. Pike, 12 Ill. App. 506; Chicago etc. R. Co. v. Harmon, 12 Ill. App. 54; St. Louis Coal R. Co. v. Moore, 14 Ill. App. 510; Franz v. Thieben, 15 Ill. App. 482; Davis v. People, 114 Ill. 86; American Ins. Co. v. Crawford, 89 Ill. 62; Mendota v. Fay, 1 Ill. App. 418; Harvey v. Miles, 16 Ill. App. 533; Cothran v. State, 39 Miss. 541; Payne v. Green, 10 Smed. & M. 507, Miss.; Crole v. Thomas, 17 Mo. 329; Otto v. Bent, 48 Mo. 23; George v. Smith, 6 Jones L. 273, N. Car.; Little Miami R. Co. v. Wetmore, 19 Ohio St. 110; Parmlee v. Adolph, 28 Ohio St. 10; Bates v. Fuller, 8 Lea 644, Tenn.; East Tennessee etc. R. Co. v. Fain, 12 Lea 41, Tenn.; Lancaster v. State, 2 Caldw. 339, Tenn.; Chicago etc. R. Co. v. Dougherty, 110 Ill. 521; Missouri Furnace Co. v. Abend, 9 Ill. App. 319; Owen v. Chicago, 10 Ill. App. 465; Illinois C. R. Co. v. Maffit, 67 Ill. 431; Warren v. Wright, 3 Ill. App. 602; Peoria etc. R. Co. v. Wagner, 18 Ill. App. 598; Toledo etc. R. Co. v. Grable, 88 Ill. 441; Flaherty v. McCormick, 7 Ill. App. 411; Covert v. Nolan, 10 Ill. App. 629; Ruff v. Garrett, 94 Ill. 475; Keyes v. Fuller, 9 Ill. App. 528; Bauchwitz v. Tyman, 11 Ill. App. 186; Neurberg v. Gaulier, 4 Ill. App. 348; Chapin v. Thompson, 7 Ill. App. 288; Swan v. People, 98 Ill. 610; Chicago etc. R. Co. v. Dvorak, 7 Ill. App. 555; Franklin Turnpike Co. v. Crockett, 2 Sneed 198, Tenn.; Wicks v. State, 44 Ala. 398; Ming v. State, 73 Ala. 1; Hughes v. Anderson, 68 Ala. 280; Sparks v. Mack, 31 Ark. 666; People v. Ramirez, 13 Cal. 172; American Ins. Co. v. Crawford, 7 Ill. App. 29; Warren v. Wright, 3 Ill. App. 602; Moshier v. Citchell, 87 Ill. 18; Illinois Cent. R. Co. v. Hammer, 72 Ill. 347; Bauer v. Bell, 74 Ill. 223; Snyder v. Laframboise, 1 Ill. 343; Baxter v. People, 8 Ill. 368; Chicago West Div. R. Co. v. Aviland, 12 Ill. App. 561; Pope v. Lowitz, 14 Ill. App. 96; Forman v. Ambler, 2 Dana 110, Ky.; Aikin v. Wreckley, 19 Mich. 482; Kim-

ball etc. Mfg. Co. v. Vroman, 35 Mich. 310; Staten v. State, 30 Miss. 619.

EDWARD A. MANN and HARRY P. OWEN for Appellee.

In the absence of all evidence to the contrary, it is presumed that deceased stopped, looked and listened. Baltimore & Potomac R. R. Co. v. Landrigan, 191 U. S. 461; Texas P. R. Co. v. Gentry, 163 U. S. 353; Northern Pac. R. Co. v. Freeman, 174 U. S. 397; Looney v. Met R. Co., 200 U. S. 480; Thompson on Negligence, sec 1622, 2 ed.; Northern Pac. R. Co. v. Spike, 121 Fed. 44; Johnson v. Ry. Co., 20 N. Y. 65; Oldsfield v. Harlem R. Co., 14 N. Y. 310; Adams v. Iron Cliffs Co., 44 N. W. 270, Mich.; Ry. Co. v. State, 20 Md. 420; Railroad Co. v. Nowicki, 46 Ill. App. 566; The City of Naples, 32 U. S. App. 613; Allen v. Williard, 57 Pa. 374; Schum v. Railroad Co., 107 Pa. 8; Cox v. Ry. Co., 31 S. E. 848; N. C.; McGee v. Kennedy, 66 Fed. 502; Chesapeake & O. Ry. Co. v. Steele, 84 Fed. 93; Hendrickson v. Great Northern R. Co., 16 L. R. A. 261; Pa. R. Co. v. Neher, 76 Pa. 157.

The question of contributory negligence was for the jury. Grand Trunk Ry. Co. v. Ives, 144 U. S. 408; New York S. & W. R. Co. v. Moore, 105 Fed. 725; Chesapeake & O. R. Co. v. Steele, 84 Fed. 93; Northern Pac. R. Co. v. Austin, 64 Fed. 211; A. T. & S. F. Ry. Co. v. McClurg, 59 Fed. 860; Delaware & L. Ry. Co. v. Devore, 122 Fed. 791; St. L. & S. F. R. Co. v. Barker, 77 Fed. 810.

Instructions as to contributory negligence. Baltimore & O. Ry. v. Griffith, 159 U. S. 603; Texas & P. Ry. Co. v. Cody, 166 U. S. 606; R. R. Co. v. Glannor, 15 Wall. 401; Hough v. R. Co., 100 U. S. 213; Coasting v. Folson, 139 U. S. 551; Railroad Co. v. Volk, 151 U. S. 73; Railroad Co. v. Gentry, 163 U. S. 353; Kreigh v. Westinghouse, 214 U. S. 255; Gardner v. Michigan C. R. Co., 150 U. S. 349; Northern Pac. Ry. Co. v. Austin, 64 Fed. 211; Railroad Co. v. Converse, 139 U. S. 469; Elliott v. Ry. Co., 150 U. S. 245; Railroad Co. v. Meyers, 62

Fed. 367; Railroad Co. v. Kelly, 63 Fed. 407; Northern Pac. R. Co. v. Freeman, 174 U. S. 179; Hook v. Mo. Pac. Ry. Co., 162 Mo. 569.

Evidence in the nature of preliminary examination of witnesses upon the question of the admissibility of a diagram which incidentally tended to show subsequent changed condition, was relevant and competent when not offered to prove a consciousness of an antecedent negligence of the defendant. Columbia R. Co. v. Hawthorne, 144 U. S. 202; 1 Wigmore Evidence, 283, sec. 437; Corcoran v. Traction Co., 15 N. M. 9; Ry. Co. v. Wyatt, 73 Am. St. 926; Terre Haute Ry Co. v. Clem., 18 Am. St.; St. Louis & San Francisco Ry. Co. v. Weaver, 57 Am. Rep. 176; So. Car Mfg. Co. v. Wagner, 14 N. M. 195; Territory v. Pierce, 16 N. M.; Laird v. Upton, 8 N. M. 409; Fruit Exchange v. Stamm, 9 N. M. 361; Bell v. Shingle Co., 35 Pac. 405.

Where brief does not touch upon assignments or cite authorities in support thereof, such assignments are deemed waived. Blue Creek etc. Co. v. Anderson, 99 Pac. 444; San Pedro etc. Co. v. Board of Education, 99 Pac. 263; Cent. Digest, App. & Error, secs. 4256-4261, 1078; Gildersleeve v. Water Imp. Co., 4 N. M. 318; Neher v. Viviani, 16 N. M. 10; Gray v. Walker, 108 Pac. 278, Cal.; St. Louis R. Co. v. State, 95 Pac. 874, Okla.; Home Association v. Sargent, 142 U. S. 691.

STATEMENT OF THE CASE.

This is an appeal from a judgment for five thousand dollars recovered against the appellant in the district court of Valencia county by the appellee as the sole surviving parent of Antonio Padilla, deceased. The complaint is in the usual form, charging that Antonio Padilla, deceased, was killed by a locomotive operated by the appellant company. The accident occurred at a public crossing near the town of Los Chaves in Valencia county, New Mexico. The plaintiff in the lower court and her son Antonio had lived all their lives in a small settlement some two miles south from the railway crossing where the accident occurred. There is no direct testimony in

the record to the effect that Antonio Padilla had any familiarity with the Los Chaves crossing, where the accident happened, prior to the day of this occurrence. .The evidence in the case established the following facts: At a point 42 feet south from the crossing is a cattle guard At a point 205 feet from the center of the crossing, a contra acequia crosses the line of railway at right angles and at a grade even with the road bed. At a point 1144-feet south from the crossing another road crossed the railway, and at a point 1320 feet south of the Los Chaves crossing there was established a regulation whistling post for the Las Chaves crossing. South of the crossing and west of and parallel to the railway a right of way fence extended from the wing fence at the crossing to a point 418 feet south, at which point the fence closed in toward the railway track to a point within nine and one-half feet of the center of the track, and from this point (418 feet south of the crossing) a hedge fence enclosing an orchard, paralleled the west side of the track south for several hundred feet, at a distance of nine and one-half feet from the center of track. Between the crossing and said 418 foot point south, on the west side of the railway, (being the northeast corner of the hedge fence and orchard), there were at the time in question a number of cottonwood trees in full foliage, several trunks 18, 20 and 22 inches in diameter, all between the right of way fence on the west, and the railway tracks; and the branches of these trees extended at places to within twelve feet from center of the track and within thirty feet of the track and all of these trees were within 306 feet south of the crossing. Weeds, bushes and sun flowers were growing within the right of way on the west side of the railway and on the banks of the contra acequia which crossed the railway at the 205 foot point, to a height of "little more or less than the height of a man, two, three or four feet high." By actual measurement a warehouse stood, its north end 56½ feet, and its south end 58 feet from the center of the track on the south side of the highway as one approached the crossing from the west; following the highway southwesterly from this warehouse, the next

house from the highway crossing was the residence of the witness Jose F. Padilla, a distance of thirty-five or forty yards from said warehouse, and between the walls of these two houses said witness had a truck garden and sweet corn growing at the time in question; between these two buildings and at a point about 60 yards from the crossing the road bends to the south, about ten feet south of Padilla's residence is another house, and south of this last house are corrals and other buildings. Looking east from the rear of the residence of Padilla toward the track there were many trees between it and the track and crossing. Antonio met in collision at the crossing in question a light passenger locomotive of the defendant company, which was moving northward at at least the conceded rate of about thirty miles an hour at the point of collision. This locomotive was manned by an engineer and a fireman. The engineman had been operating a passenger locomotive between Albuquerque and Clovis since 1906, and over the crossing in question on every trip. The fireman was a green hand and had been working for the company defendant as a fireman for about a month. On the run from Belen to Albuquerque, when about a mile out of Belen the engineman stopped the locomotive for about five minutes to pack a hot box. The engineman could not bring the locomotive to a stop until he had reached a point five telegraph poles beyond the point of collision, and eight telegraph poles from the point of shutting off steam and application of the emergency brakes. Telegraph poles are about forty yards apart. The engine struck the wagon at front wheel, the horses lurched and jumped over the track to the east side, tore the wagon from the horses, and the team ran to the right side. The impact threw the wagon thirty or forty feet beyond the crossing, inside the right of way fence and north of the cattle guard on the north side of the crossing and inside the board fence (wing fence) about fifteen yards. The boy and part of the wagon were thrown on the pilot and carried to the point where the locomotive was brought to a stop. The principal error assigned by the appellant involving, as it does, a question of fact, necessitates the setting out at length of all the testi-

mony. relating to the forward movement of the deceased toward the crossing just prior to the time of the accident. Six eye witnesses testified thereto for the appellee and two for the appellant. Jose de la Cruz Salas for the appellee testified:

Q. Did you see the locomotive that struck Antonio, the engine? A. Yes.

Q. When did you first see it? A. At the time that he reached the track, I turned around and saw it.

Q. Had you seen the engine before that time? A. No.

Q. State whether or not you heard the whistle or the bell prior to the time Antonio was struck? A. At the time I saw him she whistled and rang the bell.

Q. How close was it to Antonio at that time? A. Something like thirty yards.

Q. And where was Antonio at that time? A. At the track.

Q. How was the engine running, at what speed; fast or slow? A. Somewhat fast.

Q. What was Antonio doing when you looked around. A. When I looked around he raised from the seat and raised the whip to strike the horses.

Q. Did you see the locomotive strike him? A. Yes.

Q. Did you see Antonio after that? A. No, I did not see him only at the time he was struck by the engine.

Ramona Gabaldon for the appellee testified:

Q. Where were you with reference to this crossing when you saw Antonio Padilla? A. I was getting to the main road and he was right in front of me.

Q. From what direction were you coming? A. I was coming from the north down.

Q. And in what direction was Antonio Padilla going when you saw him? A. He was, going to get across the track and was going down when he met me and said "Good Morning," and he went up the track when the engine struck him.

Q. How far from the track were you when you met him? A. About—I was about 15 or 20 yards, from him when the engine killed him.

Q. State whether or not you heard or seen the engine prior to the time it struck Padilla? A. I did not see it.

Q. Had you heard it? A. No.

Q. State whether or not the engine whistled or rang the bell or gave any alarm prior to the time it struck Antonio Padilla? A. No, I did not hear anything until I saw the engine strike the wagon and raised him up.

Q. When did you first see the locomotive or engine? A. When it struck the boy and killed him. I did not see it before.

Q. And when did you first hear it make any sound? A. When it struck the wagon and boy and raised them.

Q. How is your hearing? A. Well.

Q. How is your eyesight? A. Well.

Q. When you saw the engine was it running fast or slow? A. At the time it struck the boy it kind of stopped but kept on going.

Q. How long did it go before it stopped? A. About two hundred yards more or less. I do not know exactly.

Q. Were there any cars attached to the engine? A Not any. It was an engine alone.

Q. He turned around and spoke to you and said good morning? A. Yes.

Q. Faced to the north, did he, faced you? A. Yes. He saw me and said good morning.

Q. Were the horses walking or trotting? A. They were walking when he said good morning.

Q. Did he keep right on up to the track until they were struck? A. Yes. When he was on the track the engine arrived.

Q. You noticed him all the way from the time he spoke to you until he reached the track, did you? A. I saw him when he was killed.

Q. How far had you gone from the time he spoke to you until he was struck? A. How far had I walked?

Q. Yes. A. I remained standing for a long while there.

Q. In the middle of the road? A. I was just going out into the road.

Q. You had not crossed the road at the time the accident happened? A. No. I had not crossed the road.

Q. You are absolutely certain he kept on going up the track after he spoke to you, are you, Mrs. Gabaldon? A. Yes.

Q. Did you hear the whistle blow or the bell ring at the time the boy was struck? A. Before, at the time it struck the boy on the wagon I heard it.

Q. You heard the bell ring, too, did you? A. When he was struck yes. I heard the bell ring, too.

Q. How far was it from where you were standing when you heard the bell ring? From the track—how far were you from the track when you heard them? A. Didn't I tell you about 15 or 20 yards?

Q. When you met Antonio in which direction were you going? A. I was going down.

Q. And which direction was Antonio going? A. Antonio was getting onto the track towards where the sun rises.

Q. And about how far did you say from the track you thought it was? A. About fifteen or twenty yards, more or less.

Q. And after you met Antonio which way did you go? A. I took my road toward my daughter's.

Q. How far had you gone on the road to your daughter's when the engine struck Antonio? A. I did not walk towards my daughter's house when he was killed. I was standing there.

Q. And did you see Antonio all of the time from the time you met him until the time the engine struck him? A. I saw that the engine that struck him was running.

Q. Did you see him all the time after he passed you, until he was struck by the engine? A. Before? Yes.

Q. Did you keep your eyes on Antonio all the time after you met him until the engine struck him? A. He had just got through telling me good morning when I heard a noise and turned around and saw him struck by the engine.

Maria Garcia for the appellee testified:

Q. Did you see the accident? A. No, I did not see the boy killed.

Q. Did you see the boy at all? A. I saw the boy when he was getting on the track.

Q. Where was the train at that time? A. It was about the cattle guard on the track; then I went in because I did not want to see him get killed.

Q. Where was the boy when you first saw him? A. He was on the wagon getting onto the crossing.

Q. He was coming towards you or going from you? A. The boy was on the wagon coming up on the crossing.

Q. And where did you say the engine was at that time? A. In front of the house of Jose Francisco, more or less when I went in.

Q. Why did you go into the house? A. Because I knew he was going to be struck and I did not want to see him die.

Q. When did you first hear any whistle or bell, if you did hear one at all? A. I was inside the door of my house.

Q. Was that before or after you saw the boy coming up on the track? A. I had went into the house when I heard the whistle.

Q. How long had you been standing out in front of your house before you saw Antonio? A. More or less I presume—I cannot say, because I knew the train was coming for him and I went in.

Q. How long had you been standing out there in front of your house when you first saw the engine? A. Not more than a moment. Just as soon as I saw it coming I went in.

Q. How was the engine going, fast or slow, when you first saw it? A. Fast, very fast.

Q. Were you looking south at the time the engine was coming? A. I was looking toward the crossing, where the boy was coming.

Q. How long had you been looking in that direction? A. Just a moment, and when I saw him go, I went right in.

Q. He drove right up to the track, did he? A. Yes.

Q. Did you see him speak to a lady there at the road? A. No.

Q. Did you see a lady in the road? A. No.

Q. How long before he got to the crossing had you seen him? A. I do not know how long it was when I saw him—just a few moments when I saw him and went right in.

Q. He was driving right up to the track, was he? A. Yes.

Q. And he was looking towards you, was he? A. I think not, because he was driving his horses.

Q. He was looking at his horses, was he? A. I believe so. I do not know.

Q. You do not know what he was doing except driving right up on the track? A. He was driving his horses.

Q. How fast were the horses going? A. I do not know; they were walking.

Q. Did you call out to him, give him any alarm of having seen the engine? A. No, I did not.

Q. Are you certain that the bell was rung and the whistle blown at the time they struck the wagon? A. At the same time I heard the noise of the wagon I heard the whistle.

Q. And you were in your house then? A. I was on the inside of my house.

Q. Can you see there standing there in front of your house—can you see a person approaching the railroad track from the west any considerable distance? A. I do not know.

Q. Where was this boy's team, his horses, with reference to the railroad track when you first saw him? A. He was approaching to the track.

Q. How close was he to the track when you saw him? A. The horses were just approaching, getting to the track, when I saw and went in.

Q. You had seen the engine before this time, had you? A. No, I saw it at that time.

Q. That is the first time you saw it, at that exact minute, was it? A. Yes.

Q. You knew he was going to be struck? A. I saw the engine coming very fast, and I believed he was going to be struck.

Q. You saw the engine before the horses come on the track? A. No, I saw the engine and the horses at the very same time and I went in the house.

Q. You were standing in your door? A. Yes, I was standing in the door.

Jose Ramon Sanches for the appellee testified:

Q. Now, when did you see the engine that struck Antonio? A. I saw it at the time it struck him.

Q. When did you see it first? A. At the time that the engine whistled I turned around and I saw at that very instant he was struck.

Q. State whether or not you heard the engine whistle or the bell ring prior to that time? A. No, I did not hear it more than a little before it struck him.

Q. Where was Antonio when you heard the whistle? A. He was on top of the track.

Q. And how far from him was the engine at the time it whistled? A. More or less I should judge about fifteen or twenty yards.

Q. And you heard the engine whistle? A. I heard it at the time it struck the wagon.

Q. Did you turn around and look, at the time you were looking at the wagon, at the time the collision occurred? A. I turned my head around when I heard the whistle.

Q. And when you turned around you saw the engine strike the wagon, is that right? A. Nearly at the instant.

Doroteo Gabaldon for the appellee testified:

Q. When did you first see that engine? A. When I crossed the track.

· Q. And where was the engine when you crossed the track? A. It was about half a mile below.

Q. State whether that engine gave any warning of its approach by whistling, ringing the bell or otherwise? A. Did not give any before it touched the wagon.

Q. Now, I wish you would describe to the jury what

you saw when the engine struck the wagon? A. I saw the machine coming, at that time I saw it raise the wagon.

Q. Where was the wagon when you first saw it? A. I did not see it more than when it was raised.

Q. State whether or not you saw the boy at that time? A. I did not see the boy at that time, but when it struck the wagon, I saw the boy flying.

Q. Did you know where the boy was struck? A. I saw him afterwards when I saw another man take him off the engine.

Q. When you approached this crossing on this particular morning you say you saw the engine—did you look down the track before you crossed it? A. When I got upon the track I saw it.

Francisco S. Chaves for the appellee testified:

Q. Did you see the accident? A. I saw it at the time the engine struck the wagon, and saw that the engine raised the wagon.

Q. What first attracted your attention? A. The blow that it gave the wagon, and at the same time I heard the whistle.

Q. Had you seen the engine or heard it prior to the time it struck the wagon? A. No.

Q. At the time the engine struck the wagon, how was it running, fast or slow? A. From what I could judge when it went by the house there that was my father's house, from all appearance it was fast.

Q. Was that before or after it struck the wagon? A. After it struck the wagon.

Q. How far did the engine go before it stopped? A. About five telegraph poles.

The engineer operating the locomotive testified for the appellant as follows:

Q. What, if anything, happened after you sounded this whistle for the second crossing? A. Nothing happened until I see the horses approaching the crossing from the left side.

Q. Were you looking ahead at that time? A. Yes.

Q. How far were the horses from the crossing when

you saw them the first time?    A. About thirty feet I should judge.

Q.    Was there anyone driving the horses?    A. I do not know; I could not see anyone on account of the engine.

Q.    Now, then, what happened?    A. When I put the brakes into emergency and the team was approaching the track, and sounded the succession of whistles, the team drove up with their front feet between the two rails with the lines tight on them, and when I got right close to them at the rate of speed I was going, I saw the rein slackening, and the horses gave a lurch and jumped over the track. I went about five telegraph poles before I could stop. I got off the engine and started back towards the crossing where the wagon was hit, thinking that some one must have been injured as there was the box of the wagon and some hay on the north side of the crossing where the wagon was hit.

Q.    When you first saw those horses which you say were about thirty feet from the track, were they farther or nearer than the fence?    A. Nearer the track than the fence.

A.    Now, if you do not know whether the fence was ten feet or more, how do you know the horses were 30 feet away?    A. The distance looked to me—seemed to be thirty feet, just to the foot of the incline.

Q.    How far were you from the crossing at that time? A. I was inside of the cattle crossing.

Q.    Inside the cattle guard?    A. Inside the south crossing.

Q.    Where were you in reference to the cattle guard at the north crossing?    A. I do not know the distance I was up there, it was just inside the other—at the south crossing.

Q.    Then if you were just inside the south crossing, you must have been in the neighborhood of 120 yards of the north crossing when you saw the horses, were you? A. According to that, I was, yes.

Q.    That is according to what you testified, is it not? A. I have guessed at it all.

Padilla v. Railway Co., 16 N. M. 576.

Q. You did not see the boy at all? A. No, sir.

Q. Just saw the horses? A. Saw the horses backs above their hips.

Q. What was the reason you could not see further back? A. On account of the engine; the distance from the cab to the front of the engine.

Q. You could see the rear part of the horses, but not the front part? A. I saw the horses' heads back to about the middle of the back. Did not see the rear part of the horses at all, near the wagon.

Q. Did you say the engine being in front of you prevented you seeing the rest of the team, the rear part of the horses? A. The distance from the cab to the front of the engine.

Q. What did you do when you saw the horses? A. Blew a succession of whistles and shut the engine off and put on brakes and emergency.

The fireman testified as follows:

Q. Just before the collision state whether you saw anything near the crossing, and if so, what it was? A. I seen a man driving up in a wagon.

Q. How far was he from the railroad track when you saw him the first time? A. About thirty feet.

Q. What did you do? A. I hollered to the engineer, and he was already sounding warning whistle.

Q. And what was the man in the wagon doing? A. He was driving across the track.

Q. Which way was the man looking? A. He seemed to be looking towards the engine.

Q. Do you remember how he was holding the reins, or what he was doing in the wagon? A. He seemed to tighten up on the lines and then release them.

Q. And what happened after you hollered to the engineer and he sounded the whistle? What was done with the engine by the engineer ? A. He shut the engine off and put the brakes into emergency.

Q. What happened after he put on the brakes and emergency to the speed of the engine; just state what was done? A. Stopped about the length of five telegraph poles.

Q. When you hollered to the engineer that is the time the whistle was sounded, is that right? A. It was already sounded.

Q. But you had not seen the man then? A. I had seen him before he was hit, yes.

Q. Had you not seen him when you called to the engineer? A. Yes.

Q. And the whistle was blown at the time when you hollered? A. Yes.

Q. And how far was that from the second crossing? A. Must have been two hundred yards.

Q. And the man was thirty feet from the track? A. About thirty feet, I guess. I never measured.

Q. What makes you think it was about thirty feet? A. Well, it looked that way from a distance.

Q. Well, you were looking at the man all the time, were you? A. After I got up and was ringing the bell, I seen the man about thirty feet from the track.

Q. Were you looking at him all the time? Did you see him pull up the reins and slacken the reins again; didn't you see that? A. Yes.

Q. And at the same time you saw the engineer throwing on the brakes. A. He shut the engine off with one hand and was sounding the whistle with the other.

Q. And you saw that, did you? A. Yes.

Q. Then you saw him throw the brakes, too, did you? A. Yes.

Q. And at the same time you saw this man driving his horses and pulling up the line and slackening up again? A. Yes.

Q. The engineer was on the right side of you and this man and team were on the left? A. Yes.

Q. You are not cross-eyed are you? A. No, I do not think I am.

Q. And you say it ran five telegraph poles after the emergency brakes were put on? A. Yes.

Q. You mean five telegraph poles after you struck the wagon or five telegraph poles from where you put on the emergency brakes 200 feet from the crossing? A. I

guess it was about that after it was put on, after they were put on.

Q. Did not the engine run up five telegraph poles past the crossing before it was stopped? A. I said about that distance, I do not know if it was just that or not.

Q. Now, let me understand you. You mean five telegraph poles from the crossing where the boy was hit to where the engine stopped? A. About that.

Three photographs were introduced in evidence by the appellant. Referring to these photographs the claim agent of the appellant testified that on the day of the accident from a point twenty-five or thirty feet west of the track he could have seen three hundred and fifty yards to the south, that being the direction from which the engine was approaching which killed Antonio Padilla, and that also from a point in the middle of the wagon road west of the track at a point opposite the wing fence and right of way fence he could see one hundred and seventy-five yards in the same direction.

## OPINION OF THE COURT.

WRIGHT, J.—While there are numerous assignments of error, the majority of them relate to the same proposition and will therefore be considered as one general assignment.

1. The appellant contends that the conduct of the deceased, Antonio Padilla, was the proximate cause of the accident and of his death and precludes any recovery by the plaintiff. The law governing the duty of a traveler upon a public road approaching a railway crossing is too well settled to need any extended discussion at this time. It is settled that it is the duy to approach cautiously and carefully, using his faculties of sight and hearing. Railroad Co. v. Houston, 95 U. S. 697; Schofield v. Chicago & St. Paul Ry. Co., 114 U. S. 615; Northern Pac. Railroad Co. v. Freeman, 174 U. S. 179; Weber v. N. Y. etc. Railroad Co., 58 N. Y. 45; Oklahoma City v. Reid, 33 L. R. A., n. s., 1115, Note. Failure on the part of

the deceased or injured person so to exercise due. care amounts to contributory negligence on his part and will undoubtedly bar a recovery. Northern Pac. Railroad Co. v. Freeman, cited supra. In this jurisdiction the burden of showing contributory negligence is on the defendant. "In the courts of the United States, where the just and sensible rule obtains that the burden of showing contributory negligence is on the defendant, the plaintiff in an action for damages for the death of one killed at a railroad crossing, is not under the burden of showing a lack of contributory negligence on the part of the deceased; but, after he had shown negligence on the part of the railway company adequate to account for the accident without any fault on the part of the deceased, he has established a prima facie right of recovery." Thompson on Negligence, sec. 1622, (2nd ed).

It is also too well settled to allow of discussion that. in the absence of evidence to the contrary there is a presumption that deceased stopped, looked and listened. Baltimore & Potomac R. R. Co. v. Landrigan, 191 U. S. 461, and cases cited therein. This presumption is founded on the law of nature, that is, the instinct of self-preservation. In the absence of any evidence as to. what the deceased did just prior to the accident it is never to be presumed that he was negligent. In Northern Pacific Railroad Co. v. Spike, 121 Fed. 44, the court uses the following language: "No one was with the deceased or witnessed his movements and the presumption prevails that he exercised ordinary care in approaching this crossing and that he would not have been killed but for the culpable negligence of the defendant in neglecting to give timely warning at the train's approach. The conditions prevailing at this crossing at the time of the accident were such as to make it imperatively necessary for the safety of travelers for the railway train to give the statutory signals of approach." Further on, in the same opinion, the court adds: "Nor is this presumption applied only when no one witnesses the accident. It has its application in all cases and may be strong enough to overcome the testimony of an eye witness." See, also, McGee

v. Kennedy's Adm'r., 66 Fed. 502; Baltimore & Ohio R. R. Co. v. Griffith, 159 U. S. 603; Grand Trunk R. R. Co. v. Ives, 144 U. S. 408. "When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the fact is for the jury. It is also where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the courts." Grand Trunk R. R. Co. v. Ives, cited supra; Gardner v. Mich. C. R. R. Co., 150 U. S. 349; Oklahoma City v. Reid, 33 L. R. A. n. s. 1117, Note. In the case at bar the appellant contends that the evidence relating to what happened just prior to and at the time of the accident established contributory negligence on the part of the deceased as the approximate cause of his death to the extent that it became the duty of the court to pass upon the same as a matter of law and to instruct the jury to return a verdict for the appellant and that the court therefore erred in overruling appellant's motion for a peremptory instruction to that effect. The rules applicable to cases of this character being definitely settled in this jurisdiction, it only remains for us to consider the facts as disclosed by the evidence. With this end in view we have set out all of the evidence having any bearing upon this question, in the statement of facts. A careful consideration of this evidence fails to disclose that there is any positive evidence that the deceased, Antonio Padilla, was guilty of contributory negligence. The appellant seems to rely principally upon the testimony of the witness Ramona Gabaldon as establishing the fact that the deceased failed to exercise due care in approaching the railway crossing. Giving this testimony its full weight it can only by inference establish any contributory negligence on the part of the deceased. While it is true that the evidence of the claim agent, offered in behalf of the appellant, says that the deceased could have seen the approaching engine for some distance, if he had looked in that direction, at two distinct points, there is also evidence in the record (set out in the statement of facts) tending to establish the fact

that at other points along the line of his approach to the track his view was obstructed by trees, weeds and an irrigation ditch.    No witness testified that they saw deceased at all times while he was approaching the railway crossing.    It is also in evidence that the engine which caused the accident was running light at a high rate of speed, making very little noise, and that no whistle was sounded or bell rung until the engine was practically upon the deceased.  In view of this evidence it can, therefore, well be said that reasonable men migh draw either conclusion therefrom. The motion for peremptory instruction on behalf of the appellant was, therefore, properly denied.

2.    Appellant also complains that the court failed to properly instruct the jury upon the question of contributory negligence.    An examination of the instructions given clearly discloses that the court in its instructions, both as to burden of proving contributory negligence and as to the presumption that due care and caution was exercised by the deceased in approaching the crossing, fully and fairly express the law applicable to this case.

3.    In its fourth assignment of error the appellant complains of the action of the court in admitting evidence as to the changed conditions in the immediate vicinity of the crossing after June 28, 1909, the date of the accident, for the reason that evidence of such changed conditions, when caused by the defendant company, was received by the court as an admission of consciousness of an antecedent negligence. "Accordingly, it is conceded in almost all courts, that no act in the nature of repairs, improvements, substitution, or the like, done after the occurrence of an injury, is receivable as evidence of a consciousness, on the part of the owner, of negligence, connivance, or other culpability in causing the injury. There may, of course, be other evidential purposes for which the acts in question may be relevant; in that event they are to be received, subject to a caution restricting their use to the specific proper purpose * * * * Again, since the condition of a place or a thing at the time of

an injury may always be evidenced by showing its condition before or after that time, provided no substantial change has occurred (post.sec. 437) the description of the condition of the place subsequent to the injury may necessarily involve a mention of the fact of repairs, but this use of the fact should be guarded against the misuse for the forbidden purpose. Furthermore, the failure to observe a precaution required by law, may, if unexcused, be in itself a ground of liability, though it is sometime dealt with in terms of a rule of evidence." Wig. Evidence, Vol. 1, sec. 283. "The evidence upon the question of negligence in this instance is not of that satisfactory character which authorizes us to declare that the judgment should be affirmed, although incompetent evidence was admitted. If, therefore, we find incompetent evidence was permitted to go to the jury over the objection of the defendant, we must reverse the judgment." The evidence improperly admitted in the case cited was that appellant changed and repaired the crossing subsequent to the accident, but that it was offered for the purpose of showing antecedent negligence there can be no doubt, and the large number of cases cited in the notes to the case are all cases in which like evidence was offered for the purpose of showing prior negligence. Terre Haute Ry. Co. v. Clem., 18 Amer. St. R. 45. The above are undoubtedly correct statements of the rule as to this class of evidence. An examination of the record in the case at bar clearly

**6** discloses that the evidence complained of was not admitted or received by the court for the purpose of showing consciousness on the part of the defendant company of antecedent negligence, but, on the contrary, it clearly appears that the evidence was merely preliminary for the purpose of identifying a plat which was subsequently introduced and that such evidence was strictly limited in its effect when so offered. There being no error apparent in the record, the judgment of the lower court is affirmed.