FRANCES A. RANKIN, APPELLEE, v. ELIZABETH KOUNTZE REAL ESTATE COMPANY, APPELLANT.[*]

FILED JUNE 3, 1916.  No. 18846.

1. Landlord and Tenant: REPAIRS:  INJURY TO TENANT:  LIABILITY. Where the janitor of a building used for rental purposes is also charged with the duty of making such light repairs from time to time as seem to him to be needed, and repairs the threshold of a room in one of the apartments of such building, occupied and to be occupied by a tenant, he will be regarded as the servant of the proprietor of the building in the making of such repairs, and, if the same are negligently made, and as a result of such negligence a tenant is injured, the proprietor of the building will be liable therefor.

2. ———: ———: ———: ———.  Where such repairing of the threshold was done in a way so careless and negligent that its use resulted in a nail, invisible and concealed in a board, entering the plaintiff's heel and wounding her when she stepped upon the threshold without knowledge of the dangerous condition of the same, the proprietor of the building will be held liable for wrongfully maintaining such threshold in such dangerous condition if the same would not have been seen and avoided by an ordinarily prudent person under like circumstances.

3. ———: ———: ———: ———.  Where the tenant had been promised by the agent of the defendant that he would put the premises

---

*Reversed and dismissed on rehearing.  See opinion, 101 Neb. ———.

in good tenantable condition and keep the same in repair, it was the duty of the defendant to put said premises in good repair, and the tenant had a right to expect that the premises would be in good condition so that she might walk safely from one part thereof to another, and anywhere in the apartment which she occupied without wearing shoes.

4. ——: ——: ——: ——. Where the threshold of a door in an apartment used by a tenant is, by coming in contact with many feet, worn down in the center so as to leave it in a concave condition, and the owner of the building, by his servant, causes a thin and elastic board to be nailed across the top of the threshold and a nail is driven down through the unsupported part of the board into the bottom of the threshold or the floor upon which it rests, and by reason of such use the head of the nail is broken off, leaving a sharp point which does not protrude through the threshold but remains concealed therein or in said board, but when the threshold is stepped upon the board sags and causes the nail to be projected above the surface thereof, thereby rendering the threshold defective and dangerous, and a tenant, without knowledge of such defective condition of the threshold, and within a few hours after entering into the occupancy of such premises, steps upon the threshold and is injured by the penetration of such pointed nail into the foot, an action will lie in favor of the tenant and against the owner of the building for such injury.

APPEAL from the district court for Douglas county: GEORGE A. DAY, Judge. *Affirmed.*

*Duncan M. Vinsonhaler,* for appellant.

*Benjamin S. Baker* and *Charles H. Marley, contra.*

HAMER, J.

This is an appeal from the judgment of the district court for Douglas county. The plaintiff and appellee, Frances A. Rankin, leased from the defendant, the Elizabeth Kountze Real Estate Company, a corporation, a certain apartment in a building containing six apartments. The apartment which she rented was on the first floor and on the south side of the building. On the north side of the same floor was another apartment. Between the two apartments was a hall extending east and west. It was a common hallway for the use of the two

Rankin v. Kountze Real Estate Co.

apartments, and led to a toilet room which was also for the use of the occupants of both apartments. There was no direct connection with the toilet room from either of these two apartments. Access to the toilet room from the apartment leased by the plaintiff was through a door which led from the kitchen into the hall. The lease was obtained by the plaintiff from the defendant through its agent, Payne & Slater Company. It was an oral lease and included the use of the hall and toilet room. As a part of the terms of said lease, the defendant, through one Porter, acting on behalf of Payne & Slater Company, agreed with the plaintiff to put said premises in repair and in good tenantable condition, and to keep the same in such repair during the term of the lease. On the 1st day of January, 1911, the plaintiff moved into said apartment. About 9 o'clock in the evening of the same day, and after having removed her shoes, she started to go to the toilet room through the door communicating from the kitchen of said apartment with the said hall. In doing so she stepped with her left foot on the threshold of the door. She had only just moved in and was not familiar with the premises. This threshold had been repaired by placing a board lengthwise over the same and nailing it fast to the original threshold, which was worn away in the central part, leaving a concave space which the board covered. This board was elastic and springy, and there was no support under its center, and the board would go down as pressure was placed upon it and would spring back again when the pressure was removed. The nail used to repair said threshold had been driven through said board near the center and went down into the threshold and the floor which was underneath said board. The head of the nail was broken off so that it left a sharp point on the upper end of the nail, and when the weight of a person was placed upon said board the board would spring downward and then, coming back, would cause the nail to work up and down through the hole in the board and to extend above its surface. This condition existed at the

time the plaintiff rented the apartment. It was not known to the plaintiff at the time that she moved into the apartment nor was it known to her at any time until she received the injury. On the evening when she moved into the apartment, the plaintiff stepped upon this board, which was a part of the threshold, and when she did so the nail came up above the surface of the board and the point thereof ran into the plaintiff's heel the distance of about a quarter of an inch. The defendant had not advised any person of the condition of said threshold prior to the injury received by the plaintiff, but negligently and carelessly permitted the dangerous condition of said threshold to remain, and neglected to put the same in repair or in a safe condition, and wholly failed and neglected to notify the plaintiff of the condition of said threshold. The plaintiff testified that she saw Mr. Porter, an employee of of Payne & Slater Company, and asked him if he would put the place in good repair so that it would be fit to live in, and he said that he would fix everything up in good repair for her. He also stated that he would keep it fixed up. He fixed some boards in the floor and papered and painted two rooms. There was a janitor in this building named Norlen. He was under instructions to make ordinary repairs. He was to receive his rent free. He put the board over the threshold through which the nail worked that injured the plaintiff. He made ordinary repairs without submitting the matter to anybody. Norlen testified that he moved out of the apartment into which Mrs. Rankin moved, and went down into the basement, which had formerly been occupied by Mrs. Rankin. They appear to have exchanged apartments late in the afternoon of the same day. He said that, as far as he knew, there was a carpenter there every spring to set up the screens and do a little repairing. Norlen seems to have done whatever repairing was necessary to be done, at least he so testified. "Q. In the threshold leading from the kitchen to the hall there was a board placed on the original threshold. Tell the jury who put that board on there.

A. I put one board on there myself." Later Norlen testified that he put the board along the threshold shortly after he moved in, and that the board was there until he moved out, and that that was the time when Mrs. Rankin moved out of the basement and moved upstairs into the apartment occupied until that time by Norlen. He further testified that there was a big space, and he put the board there because the cold weather began, perhaps in November. It was a strip of board which rested on the floor or threshold, he could not say which. "Q. How far did that extend? Did it go clear across the door? A. Clear across, from one jamb to the other. Q. Did that piece that you put down rest on the floor clear across? A. It rested on the floor or threshold, I could not say which. I do not remember which way I put it.   *   *   *   Q. Did it extend above the bottom of the door? A. In one side it did, at one corner of the door. The door is kind of sagged; the door was not level. It was open underneath in one corner about an inch space, and on that corner it was flush with the threshold. Q. Where this fitted up against the jamb, was the end sawed off square? A. Yes, sir. Q. And extended the full width of the—from jamb to jamb? A. Yes, sir. Q. And how did you fasten that down, Mr. Norlen? A. With nails."

Norlen put this dangerous board with the concealed nail in it over the threshold. The threshold, when repaired, was not such a thing as a competent carpenter would have constructed. Norlen knew, or should have known, what he had there. He was in the apartment a year and two months after he repaired the threshold. Norlen testified that he could not say whether the board over the threshold was in a condition to move up and down if anybody stepped on it, when he was questioned he said: "I could not say. I never noticed it. I did not pay any attention to it." This answer was somewhat evasive. The jury saw the witness and heard what he said, and they were in a position to judge understandingly about his testimony. When Norlen, as the servant of the owner

of the property, drove the nail through the board which he placed over the cavity in the threshold, so that it went down through the board and into the solid body of the threshold, leaving the upper part of the nail so that the board would play up and down upon it, exposing the sharp end of the nail to the danger and risk of injury to any one stepping upon the threshold, he knew, or should have known, that the strange and unusual thing which he constructed was dangerous, and that the threshold after he undertook to repair it was uncouth and a wicked sort of trap full of threatening destruction to any one who might step upon it. The danger was concealed because the nail was invisible. It only protruded when the board was pressed upon, and then it rose above the surface.

Mr. Slater testified that it was an old building, but they aimed to keep it up in a good state of repair; that he did not have charge of the leasing, but he remembered that Mrs. Rankin was at their place, and that she made a change, and that the rent was paid to the firm of Payne & Slater Company. Slater testified that Porter represented his firm, the Payne & Slater Company. He was asked who was janitor down there, and testified: "A. Yes; we had a man. I forget his name. He was down there occupying one of the apartments. Q. Do you know his name? A. No; I forget his name. Q. Was it Norlen? A. Norlen, I think that was his name. Q. And for his work in and about the premises was his compensation anything more than the rent free? A. No; he received his rent free. * * * Q. What were Mr. Norlen's duties there? A. Mr. Norlen was put down there mainly because we had had a lot of trouble with the water pipes freezing out, especially at night when there wasn't any water drawn off, and the water would stand still, and so his duties were to shut the water off at the base of the supply line in the basements and then turn it on in the morning. His duties, also, were to notify our office of any vacancies, and to collect the keys and take care of the keys down there. * * * Q. As a matter of fact Mr. Norlen did do some

repairs on the sidewalk and look after the yard, and do some repairs in the house?  A. I do not know of them. He may have done some repairs.  I think that he looked after the yard, and mowed the grass, if there was any, and mowed weeds and something like that.  *  *  * Q. Did I understand you that Mr. Norlen received his authority from Mr. Porter, or your firm?  A. Yes; I think he was at that time working under Mr. Porter.  Q. And what he did was for your firm?  A. Yes.  Q. And Mr. Porter was representing the firm?  A. Yes, sir."

C. A. Appleby testified that he knew Mrs. Rankin; that he lived in the same place; that he knew about the threshold of the door leading from the hall into the kitchen; that "the threshold had worn down, as any board will do by constant walking over it."  He saw the original board. "It was a rude piece of construction.  It was a very weak piece of board.  *  *  *  When I went across there I noticed a slight give in it (the board), and I stopped to think what a rude piece of construction and repairing was done on that door."  He knew that Norlen was accustomed to making repairs.

Mrs. McElhinney testified that the board had been laid lengthwise of the threshold so that it extended over the worn place where the threshold had been eaten out by coming in contact with many feet.  As the nail had been driven through a springy board, when the board was stepped on it slipped down the nail as far as the weight upon it compelled it to go, and then, when released from the weight which pressed it down, it would immediately spring back to its former position.  In time this wore the head from the top of the nail, or it broke off, and the top of the nail became sharper and sharper as the board worked up and down upon it.  To the casual observer the nail was invisible.  Any one stepping on this board was likely to be cut by an invisible lancet carrying great power to injure by reason if its concealment.  She indicated how far the nail would project when stepped upon, and said, "When you stepped on the threshold there was a nail.

The head of the nail looked like it had been worn off. The head had been worn off with the nail projecting through the threshold about a quarter of an inch, I judge. Q. Extending above it? A. Yes, sir."

Mrs. Rankin, the plaintiff, testified that she first occupied the apartment in the basement on the south side, and then she went up immediately over that apartment into the next apartment on the south side. She made arrangements for the second floor with Mr. Slater, of the firm of Payne & Slater Company, the latter part of 1910, the last week in December. She first talked with Mr. Porter, who collected the rents of the building, and then talked with Mr. Slater over the telephone, and he said he would send Mr. Porter down, and she could move upstairs. She exchanged apartments with Mr. Norlen. Porter came down from Payne & Slater Company, and told Mrs. Rankin that they said she could exchange with Mr. Norlen. She then moved upstairs, and Norlen moved down into the apartment which she had just occupied. She was to pay $10 a month as rent for the apartment which she took upstairs. They had some papering and carpenter work done for her. "Q. What did you say to him, and what did he say to you concerning what was to be done in case you leased it? A. Well, I asked him (Porter) if he would put the place in good repair so that it was fit to live in, and he said they would fix everything up in good repair for me. Q. What about keeping it in repair? A. Yes; keep it up. Q. And what did he do in pursuance of that, what was done in pursuance of that? A. He fixed some boards in the floor and painted and papered two rooms. Q. And when was this done, this work done, with relation to the time you went in? A. Well, it was the first days in January."

The street seems to have been filled so that the second floor became the first floor. She testified that she got her injury on the second floor, that is, the floor to which she moved; that she paid rent for the room that she occupied where she was injured; that her sister went and paid the

rent and took a receipt for it; that the toilet on the floor to which she moved was for two apartments, one on the south side, and one on the north side; that Mrs. Appleby occupied the one on the north side, and she occupied the one on the south side.

Mrs. Rankin testified to the manner of receiving her injury: "Well, I was very tired after moving, and I removed my shoes, and as I stepped out from the kitchen.   *   *   * Q. Tell what happened?   A. As I stepped out I got my heel on the threshold and stepped on a nail which went into the large part of my heel."

The plaintiff testified that she was an experienced nurse, but that she is unable to follow her business as a nurse since receiving the injury. She had taken instructions in nursing in Oklahoma City, and was also employed in the Clarkson Hospital in Omaha. She had about 20 years' experience.

Porter testified that he was at the building every day while his company had charge of it. Porter promised the plaintiff, according to her testimony, to keep up the repairs; but he denied it. Norlen seems to have had authority to make repairs. At least he made them when he saw fit. Porter made such repairs as he thought proper. Norlen and Porter were therefore engaged in looking after the building and in making repairs upon it. As Porter was the secretary of the Payne & Slater Company, which was the agent of the defendant company, he was not the servant of the defendant company, but an agent, while Norlen, who lived in the building, was the servant of the defendant company. He was the janitor and, like other janitors, lived in the basement of the building without paying rent.

The plaintiff's brother, Victor Snygg, was present when she was injured. He looked for the nail that inflicted the wound and could not find it. He could not spring the board down with the mere weight of his hand, but finally did it with the weight of his body resting on his knee. He said the nail would protrude a quarter of an inch.

The testimony of the witness Mrs. Anna Brown shows horrible suffering upon the part of the plaintiff. The doctor had removed the bones inside of the heel so that the witness could almost put her fist in the cavity. They would remove the bandage and pull the gauze out of the cavity. The last operation was more severe than those preceding it. "They dug into the bone still more, and I saw where they scraped it out until the red blood would come, too."

Dr. Mack testified that the wound was about a quarter of an inch deep, inflamed, and that there was a considerable discharge from it; that it was extremely tender, and that the plaintiff complained of severe pain; that he inserted a probe into the wound and found it to be about a quarter of an inch deep, and probably about an eighth of an inch in diameter; that blood poisoning had developed at the time of his examination; that when he opened the wound he cleansed the part as antiseptically as he could, and then put a little knife in carbolic acid and in alcohol and opened the wound with it; that he removed the tissue which was sloughing; that he then cauterized the wound, that is, burned it with carbolic acid; that after burning it out he applied antiseptic dressing; that the next day he removed the dressing and applied another antiseptic dressing; that the tissue was degenerating, that it was dying; that the next morning after that he was telephoned to come, and that he went to see her and found the foot badly swollen, and that she was suffering intensely, and he then took her to the hospital; that when they arrived at the hospital he immediately took her to the operating room and gave her an anaesthetic and opened the foot and gave it a thorough cleaning out; that he made an incision an inch and a half long in the heel and probably an inch in depth until he thought he had gotten beyond the area of infection; that this was on the 8th day of January, and on the 9th of January he dressed the foot, and again on the 10th of January, and found that the sloughing or dying of the tissue had gone .

on beyond; that he operated on the foot again on the 10th; that the foot was opened still· further and deeper and was cleaned out again; that he dressed her foot every day until the 22d of January, when she was operated on again, this time going still deeper and making the opening still larger; that he dressed the foot every day until the 17th day of February, when she was again given an anaesthetic and a very extensive operation was made; that the bone in the heel called the os calcis had completely degenerated, and it was removed, and practically all of the tissue within the heel was removed because of its sloughing; that he dressed the foot regularly until the 1st day of April, when the plaintiff was dismissed from the hospital; that each day he would pack into the wound a strip of gauze a yard long and about two and one-half inches wide; that he removed the packing and irrigated the foot with an antiseptic solution, using about two quarts of the same; that there were four operations, and that these operations were necessary; that the condition was the natural and probable result of the penetration of the nail into the foot producing the puncture which he found.

Dr. Mack testified that, because of the injury which she had received, the plaintiff would be unable, after walking a block or two, to stand on her foot; that there was no question but that there was a permanent injury of the nervous system beyond the removing of the bone. "Q. What would you say, in her condition, knowing all about the duties of nurses, whether or not she would ever be able to continue that calling of nursing? A. She will never be able to do general nursing. Q. She will never be able to do that? A. She will not." He also testified that she had been a good nurse; also, that she had received for her work $20 and $25 a week.

Mrs. McElhinney testified that she knew Mrs. Rankin to be very strong when she was a girl, and in perfect health before she was injured. She went to see Mrs. Rankin in the hospital every day for three months. She testified: "I saw Dr. Henry split her heel open clear to the bone,

turn it back and scrape it and take part of the bone away, and sew it up again."

We have carefully read all the evidence. The plaintiff was so injured that witnesses testify she will be unable to continue her occupation. The bones in the heel appear to have been removed. Apparently she is likely to be a cripple all her life.

In the sixth instruction the following language is complained of: "In considering the question as to whether the defendant knew of the condition of the threshold, you are instructed that the law charges the defendant with such knowledge as was actually brought to its attention, or such knowledge as it would have had, had it exercised ordinary care with respect to the premises." This cannot be prejudicial to the defendant, because if the defendant's servant had exercised ordinary care he would have known, and his knowledge must be the knowledge of the defendant. He was on the ground and what he did he did on behalf of the defendant.

The seventh instruction contains the idea that the defendant was only required to act as any ordinary person would have done under like circumstances, and, if the jury believe that the defendant so acted, then the defendant is not liable. We find nothing prejudicial to the defendant in this.

In *Young v. Rohrbough*, 84 Neb. 448, the law appears to be laid down that, where the landlord leased premises defective in construction and an injury occurs on account of such defective construction, then the landlord is liable for such injury, if he knew, or under all the circumstances ought to have known, of such defective condition. The plastering fell off the walls of the room and killed a lady member of one of the fraternal societies which rented it. The building was constructed by the Rohrboughs, but they afterwards sold and transferred it to the Commercial Building Company. In the suit brought by the administrator, the Rohrboughs and the Commercial Building Company were each made defendants. On the

trial of the case in the district court it was held that the Rohrboughs were not liable, but there was a verdict and judgment against the Commercial Building Company. It appealed. There was a contention made that, if the Rohrboughs were not liable, then the Commercial Building Company was not liable. This court held that the judgment was properly rendered against the Commercial Building Company. On a rehearing a new trial was granted, *Young v. Rohrbough,* 86 Neb. 279; but the rule laid down in the former *Rohrbough* case was left unmodified and unchanged, although the former judgment of this court was vacated and the judgment of the district court was reversed, yet it was for a new reason not before considered in the case, and based upon the doctrine that, "where all the defendants are by the court's instructions placed in the same relation with respect to the plaintiff, a verdict in favor of two defendants and against another, based upon conflicting evidence which is the same as to all of the defendants, will not be permitted to stand." In the body of the opinion it is said: "For the reasons above stated, our former judgment of affirmance is set aside, the judgment of the district court reversed as to the defendant Commercial Building Company, and the cause remanded for further proceedings." The opinion cites *Gerner v. Yates,* 61 Neb. 100, where it was held: "A verdict in favor of one defendant and against another, based upon conflicting evidence which is the same as to both defendants, cannot be permitted to stand as to either."

In the instant case the landlord specifically agreed, according to the evidence, to put the premises in good repair for occupancy and to keep them so. The threshold was in a dangerous condition at the time of making the lease, and at the time the plaintiff took possession of the premises, and it was made dangerous by the servant of the defendant, Norlen, and it was maintained in its dangerous condition by the defendant.

In *Carson v. Godley,* 26 Pa. St. 111, the landlord was held liable for injury resulting to the plaintiff in the

100 Neb.—6

fall of the building in which poor material had been used, and which was poorly constructed. It was stated in the opinion: "Such is the eagerness of capitalists for large rewards that, when they undertake to build for the profits of rents, the temptation is strong to cheapen and slight the work. The safety of life and property is lost sight of in the dazzling prospect of a large rent from a small outlay. Foundations are put down and walls run up in such haste and with such materials as to be wholly inadequate for the purposes designed. * * * But where, as in the case before us, it is found, on abundant proof, there was no negligence either in the tenants or the plaintiff, it is a salutary rule of law that holds the owner answerable for his gross neglect in constructing and renting an insecure building."

As the defendant agreed with the plaintiff to put said premises in good tenantable condition and to keep the same in repair, the defendant is liable for the damages that resulted because of the breach of the contract which was made. The law should be so applied that the blame for the maintenance of the trap which Norlen constructed should be properly borne.

"If a landlord lets premises and agrees to keep them in repair, and he fails to do so, in consequence of which any one lawfully upon the premises suffers injury, he is responsible for his own negligence to the party injured." *Edwards v. New York & H. R. Co.*, 98 N. Y. 245.

This case is widely different from *Davis v. Manning*, affirmed in 97 Neb. 658, and reversed and overruled on rehearing in 98 Neb. 707. The plaintiff in that case alleged that a part of the floor of the kitchen near the stove was in a dangerous and defective condition; that the "under portion of the boards of the floor were rotted, leaving but a thin upper part solid and apparently strong; that the floor at said place was near the ground; that the defendants, and each of them, knew, and should have known by the exercise of reasonable diligence, of the dangerous and

defective condition of said floor at said place;" that they apparently failed to notify the plaintiff; that Manning constructed the building in about 1875 and lived in it many years; that he knew that the floor was near the ground and that under parts would rot; that the plaintiff was preparing her breakfast and was standing before the stove and was about to step from the stove to the pantry; that she was standing on the said rotten and defective floor when "a part of one of the floor boards broke through, causing a hole 7 by 2½ inches in size, into which the heel and a portion of plaintiff's left foot passed, thereby throwing plaintiff, while the heel of her foot remained in said hole, onto the floor on her left side, * * * and fracturing and breaking her left thigh bone, and fracturing two of the lower ribs on her left side."

The main difference between the instant case and the case cited is that in the case cited the plaintiff had a much better opportunity to know the facts than the plaintiff in this case. In the case cited the sloping ground which would carry the water under the house was visible. That there was no ventilation could also be seen. That the house had been constructed a long time was apparent by looking at it; that there were cracks in the floor that had been covered with tin, and which showed that the floor had rotted out and was in a very defective condition. In the case cited, of course, all of these things were visible to the plaintiff. In the instant case the sharp, pointed nail was concealed. The operation of the springy board was unknown. The plaintiff had no reason to know anything about it.

The opinion on the rehearing in *Davis v. Manning, supra,* does not demand the reversal of the judgment of the district court in this case. The verdict is for $8,750 in favor of the plaintiff. It is fully sustained by the evidence, and does not seem to be excessive when the injury done is considered. We are unable to say that there is

error in the proceeding of the district court, and the judgment appears to be right.

The judgment of the district court is

AFFIRMED.

LETTON and ROSE, JJ., dissenting.

SEDGWICK, J., not sitting.