FRANCES A. RANKIN, APPELLEE, v. ELIZABETH KOUNTZE
REAL ESTATE COMPANY, APPELLANT.

FILED APRIL 14, 1917. No. 18846.

Landlord and Tenant: DEFECTIVE PREMISES: LIABILITY OF LANDLORD.
"The rule of *caveat emptor* applies to leases of real estate, and,
in the absence of warranty, deceit, or fraud on the part of the
lessor, the lessee cannot recover for personal injuries received
through latent defects therein, of which the lessor had no knowl-
edge at the time of making the lease, and which were as patent
to the lessee as to the lessor." *Davis v. Manning*, 98 Neb. 707.

Rehearing of case reported in 100 Neb. 69. *Former
judgment of affirmance vacated, and judgment of district
court reversed, and action dismissed.*

DEAN, J.

This case is here on rehearing. The former opinion is
reported in 100 Neb. 69, and in which a lengthy statement
is made. There are a number of points discussed in the
briefs upon which the evidence is conflicting. The verdict
of the jury settled these questions of fact. Among them
are whether the plaintiff's foot was injured, as she con-
tended, by a puncture from a concealed nail in a threshold,
or whether, as the testimony for defendant tended to prove,
it was injured by a nail in the heel of her shoe. At all
events, the immediate cause of her injury was blood poison-
ing caused by an infection. The verdict settled the ques-
tion whether the injury by the nail was the proximate
cause of the infection or whether the wound was infected
afterward from another source. Two questions remain to
be considered, whether, conceding the facts established as
the plaintiff claims, the landlord is liable as a matter of
law for injuries resulting from a hidden defect in a thresh-
old of which he has no knowledge, and whether the evi-
dence supports a verdict based upon a promise, made
before the plaintiff took possession, to put the premises
in repair and keep them in repair.

· The evidence as to the condition of the threshold is about as follows: The plaintiff's brother, a street car conductor, who lived with her, says that they finished moving upstairs late in the afternoon, that about 9 o'clock at night his sister told him she had stepped on something; that he first looked in the hall, but found nothing, he then looked at the threshold. He testifies: "I could see nothing by observation on the top of it. I examined it. From the appearance on the top you could not tell that there was anything wrong, but on bearing my weight on it I found there was a spring in the threshold, and on moving my hand along over there to see whether there was anything on the threshold, thinking there might be something wrong in a case like that, I found that there was a nail protruding from the threshold, which was a piece of board nailed over the threshold. Q. How did you discover that would show above the board? A. By weighting down with my knee and feeling with my hand. The weight of my hand by bearing down with the hand would not spring down enough. Q. And the weight of your knee? A. With the weight of my body on the knee, and that on the threshold, would make the nail protrude through. Q. How far would it protrude through? A. With my left it was possibly a quarter of an inch." The next morning he examined the threshold again. He was unable to pull the nail with a hammer, but, by raising the piece of wood that had been nailed down, he pulled the nail by the use of pliers. He was then asked: "Q. Could you see anything wrong with it by looking at it from a distance in the room. A. No, sir. Q. You could not see the concave under it? A. No. sir."

The plaintiff testified that she first knew the board would spring down when she stepped upon it, and, on being asked when she first discovered the nail, answered: "We noticed it that evening first, and then we examined it more thoroughly the next day. Q. Before or after the injury? A. After the injury. Q. Before that, did you notice anything wrong with that threshold? A. No." Mrs. Mc-

Elhinney testified: "Q. And stepping on the board or threshold there, state what you could see, if anything, concerning the nail you mention. A. Nothing at all except the threshold." Another witness for plaintiff who lived across the hall testified that he noticed the board about two weeks before the plaintiff moved in, and that the board had a tendency to spring when it was stepped on. On cross-examination he testified: "Q. When you stepped on it was your attention attracted to any loose nails in the board? A. No, sir."

Norlen, the man with whom the plaintiff changed apartments, testified that he nailed the board on the threshold in October, 1909, that he moved out of the apartment the same day that Mrs. Rankin moved in. He then testified: "Q. Was there anything to call your attention to the nail in any way? A. No. Q. Did you and your children use that doorway? A. Yes, we did. Q. Had you or your family heard of any nail in that threshold? A. No. Q. I will ask you Mr. Norlen whether at or about the time you left there that threshold was in a condition so as to move up and down if anybody stepped on it? A. I could not say. I never noticed it. I did not pay any attention to it. Q. Was there anything about the appearance of the threshold or its condition to challenge your attention or call your attention to the fact that it was movable and moving up and down? A. No."

This is the substance of the testimony in favor of the plaintiff with respect to the condition of the threshold. For defense, those in charge of the building testified they never heard of any defect in the threshold until this suit was begun, two years after the alleged accident, and that Norlen had no authority to make repairs. It is undisputed that the defect in the threshold was not obvious and open to observation, and that it had not been seen by any one until after Mrs. Rankin was hurt. Plaintiff conclusively established the fact that the defect was latent and hidden. She produced no evidence that the lessor or his agents had any knowledge or notice of the defect, and their testimony

Rankin v. Kountze Real Estate Co.

is undisputed that they neither knew nor had any reason to suspect such a condition.

Can a landlord be held liable as a matter of law for an injury resulting from such a latent defect of which neither he nor his agents had any knowledge? This question is settled in this state by the case of *Davis v. Manning,* 98 Neb. 707, wherein the opinion examines the authorities and lays down the rule: "The rule of *caveat emptor* applies to leases of real estate, and, in the absence of warranty, deceit, or fraud on the part of the lessor, the lessee cannot recover for personal injuries received through latent defects therein, of which the lessor had no knowledge at the time of making the lease, and which were as patent to the lessee as to the lessor." The condition of the case brings it clearly within the rule in *Davis v. Manning,* and there can be no recovery on this theory.

Upon re-argument and re-examination of the case, we are satisfied that the agreement to make repairs, even if it was as the plaintiff states it, would not include such defect, if it existed as described by plaintiff and her witnesses. The testimony, not only of the witnesses called by defendant, but as well those called by plaintiff, establish the hidden nature of the defect. The testimony discloses that it comes within the generally accepted and recognized definition of the expression "latent defect" as used by law-writers. On this point the law seems to be well settled. *Bennett v. Sullivan,* 100 Me. 118, announces a rule that is generally accepted: "The owner of private property owes to a prospective lessee no duty to exercise ordinary care to ascertain and apprise him of unknown defects in the property to be leased where such prospective lessee has equal opportunity to ascertain the defects." *Walsh v. Schmidt,* 34 L. R. A. n. s. 798 (206 Mass. 405) holds: "A statement by a property owner to a prospective tenant that he has fixed the house all right, that it is fit for anybody to live in, does not constitute an express warranty that there are no latent defects which may cause injury to the tenant." See, also, *Cate v. Blodgett,* 70 N. H. 316; *Morgan v. Shep-*

101 Neb.—12

*pard,* 156 Ala. 403; *Howell v. Schneider,* 24 App. D. C. 532; *Shinkle, Wilson & Kreis Co. v. Birney & Seymour,* 68 Ohio St. 328.

Our former judgment is vacated, and the judgment of the district court is reversed, and the action is dismissed.

REVERSED.

HAMER, J., dissenting.

This case is to recover damages for an injury done to the plaintiff through the negligence of the defendant by its servant, one Norlen.

The case of *Davis v. Manning,* 98 Neb. 707, was wholly unlike it. There the plaintiff had lived for several months in the house which she had rented, and she had been an occupant of the house before the time of her occupancy when injured. She knew that the floor was rotten. She knew that because there were holes that had rotted through it and which were patched up with tin. These pieces of tin were scattered over the floor of the kitchen. Each piece covered a hole. This fact is undisputed. There was no attempted denial of it. An examination of the original petition filed in that case shows that the plaintiff claimed that she "did not know of the rotten and defective and dangerous condition of the floor;" that she was preparing her breakfast and was standing near the front of her stove and was about to step from the stove to the pantry, and that "a part of one of the floor boards broke through, causing a hole about 7 by 2½ inches in size, into which the heel and a portion of plaintiff's left foot passed, thereby throwing plaintiff,  *  *  *  and crushing and bruising her left side, and fracturing and breaking her left thigh bone."

In the answer the injury does not appear to have been denied, but it was claimed that the plaintiff "had occupied and lived in said house since about the 1st day of May, 1905," and prior thereto, and that the condition of said premises was fully known to plaintiff, and was open

and obvious to her. It was said further that she assumed the risk.

Judge Sedgwick wrote the first opinion (*Davis v. Manning*, 97 Neb. 658), in which he says: "There is, however, substantial evidence, as we have said, by at least three witnesses that there had been openings in other parts of the kitchen floor which had been covered with tin," that "plaintiff's original petition was in evidence, and it contained the allegation that in other parts of the floor there were cracks and openings, and that she had requested the defendant's agents to repair the same. The defendant contended that this proved that the plaintiff had notice of the condition of the floor, and was therefore guilty of contributory negligence. The plaintiff in her evidence at the trial testified that she knew that these cracks existed in other parts of the floor and that they had been repaired." It was also all the time contended: "That plaintiff knew of the condition of the floor." On the rehearing of *Davis v. Manning*, 98 Neb. 707, it is said: "It was plainly to be seen that there were no ventilators under the kitchen, and the tenant must be held to have equal knowledge of the law of decay as the landlord."

In the instant case Norlen testified: "Q. You paid nothing for your rent for that reason? A. No. sir. Q. With whom did you make this arrangement? A. Payne & Slater. Q. They were the agents of that building? A. Yes, sir." Norlen was asked: "Q. Was one of your duties to look after the other tenants in the building? A. My duty was to shut off and turn on—shut off and turn on the water in the winter when the cold weather was on, and look after the plumbing." Payne & Slater were the agents for the building, but a man named Porter also helped with the rents.

Edwin M. Slater testified that the repairs were made through Mr. Porter; that Mr. Porter represented the firm of Payne & Slater in looking after the property of the Elizabeth Kountze Real Estate Company; that he had charge of the building and collected the rents. Slater also

testified that they had a man down there who occupied one of the apartments. "Q. And do you know as to who was janitor down there, and who had matters in charge in any way? ·Do you know anything about that? A. Yes, we had a man. I forget his name. He was down there occupying one of the apartments. Q. Do you know his name? A. No, I forget his name. Q. Was it Norlen? A. Norlen, I think that was the name. Q. Norlen? A. Yes, sir. I think that was the name."

He then testified that Norlen received his rent free. Janitors are found in apartment houses all about, and they do not pay rent because they are servants and are therefore kept in the houses for the benefit of the property and its occupants. "Q. What were Mr. Norlen's duties there? A. Mr. Norlen was put down there mainly because we had had a lot of trouble with the water pipes freezing out, especially at night ·when there wasn't any water drawn off, and the water would stand still, and so his duties were to shut the water off at the base of the supply line in the basements, and then turn it on in the morning. His duties also were to notify our office of any vacancies (empty apartments), and to collect the keys and take care of the keys down there."

Appleby testified that Norlen made repairs. "Q. Do you know whether Mr. Norlen made some repairs in and about the building? A. Well, he done some repairing." Mr. Grimmel testified that his company was to, and did, make some repairs on the building.

It will be seen that he was discharging all the duties of a janitor, and, in addition, he was assisting the company's agents by taking care of the keys and notifying the office when tenants had gone out. He was assisting in keeping the premises occupied. In addition to that, as he himself says, he turned the water on and turned it off and looked after the plumbing. The witness further testified on cross-examination that he (Norlen) may have made some repairs. I think that he looked after the yard and mowed the grass, if there was any there, and mowed weeds and

Rankin v. Kountze Real Estate Co.

something like that.   Mr. Slater was candid enough to
testify:   "Q.   And what he did was for your firm?   A.
Yes, sir.   Q.   And Mr. Porter was representing the firm?
A.   Yes, sir."

Norlen was the servant of the defendant real estate
company.   He stayed at the building to watch it and to
perform the duties of a servant.   He stayed at the building
to turn the water on as it was needed, and to turn if off
when it threatened danger by freezing up and bursting
the pipes.   He cut the grass on the lawn.   He gathered up
the keys when the tenants left, and he was their custodian.
He notified Payne & Slater when the rooms were vacant.
He did what any servant entrusted with such duties would
have done.   He was occupying the room in which the plain-
tiff was hurt just previous to the time when she received
her injury.   The plaintiff and Mr. Norlen talked over the
question of exchanging rooms.   It was then agreed that
Norlen should go out of the room where Mrs. Rankin was
injured, and that he should go down into the basement for-
merly occupied by Mrs. Rankin, and she was to go up-stairs
into the room which had been occupied by Norlen up to that
time.   Payne & Slater agreed to it, and thereupon the re-
moval was made.   On the evening of the day when the re-
moval was made, late in the afternoon, Mrs. Rankin started
to go to the toilet.   She had probably been in her new apart-
ment not more than two hours, and she knew nothing
about the danger that threatened her.   She was in her
stocking feet.   She stepped on the board which Norlen had
placed over the threshold.   Immediately the nail that was
still in this board came up through it.   It ran into Mrs.
Rankin's heel.   No one denies what happened there.   What
Norlen did was alleged to be done "for his own conveni-
ence."   Counsel for the defendant sought to excuse his
client.   Norlen was not there on his own account, but
as the servant of the defendant real estate company.
Slater says so.   Norlen was to take care of the property.
Regardless of that duty he placed a dangerous trap in the
threshold.   Mrs. Rankin had not seen it.   The nail was in-

visible. Of course, if the board extended over the threshold, which was of soft wood, it would bend down when Mrs. Rankin stepped upon it and the nail would then run up into the heel. It was that nail which made an injury that resulted in all the bones being removed from Mrs. Rankin's heel.

*Caveat emptor* applies where there is no fraud and no injury that is the result of negligence upon the part of the landlord and his servants. The job which Norlen did should have been done in a workmanlike manner by a carpenter. The company did this work with a bungling servant instead of doing it with its carpenter. The carpenter would have known how to fix that threshold. He might have charged more than the janitor cost the landlord, but he would have left a proper threshold there. The duties of a janitor are probably becoming greater as more apartment houses are constructed. The landlord is engaged in an effort to extend the service of the janitor. It is like a railroad company attempting to use a brakeman as an engineer. The janitor not only makes fires and takes away the ashes and garbage, but he may put the screens in the windows and take them out, and he may turn the water on and off, and look after the plumbing and try to make a plumber of himself. He does all this with his landlord's consent. He may also cut the grass and weeds and get new tenants and new keys for the apartments, and he may occasionally put in a new electric lamp with its wire and its necessary connections. He is the servant of all work in an apartment house by the direction of his landlord. The room which he occupies is always rent free. That is one of the badges that marks him as a servant.

Nothing was said in the original opinion which was in anyway entitled to be called a criticism upon the private character of any member of the defendant company.

If Mrs. Rankin's case should be submitted to a man sitting as a judge or a juror and having many farms or houses in the city, he might shut his eyes and ears to the evidence in spite of an upright and honest desire to be fair.

If the judgment in this case in favor of Mrs. Rankin shall finally be set aside, I shall never feel sure of anything that my friends may write, however it may be justified by the evidence.

On rehearing of *Davis v. Manning,* 98 Neb. 707, cited on behalf of the appellant, the syllabus reads: "The rule of *caveat emptor* applies to leases of real estate, and, in the absence of warranty, deceit, or fraud on the part of the lessor, the lessee cannot recover for personal injuries received through latent defects therein, of which the lessor had no knowledge at the time of making the lease, and which were as patent to the lessee as to the lessor."

It was all right in *that* case to apply the rule of *caveat emptor,* because the plaintiff then had an opportunity to know the condition of the floor where she was standing, and she did know it if she had thought of the facts within her knowledge. She had all the opportunity to know it that the landlord had. She knew of the repairs. She saw the pieces of tin covering the holes that had rotted through the floor. But the rule of *caveat emptor* is all wrong in the instant case, because here the plaintiff had no opportunity to know the condition of the threshold on which she stepped, and she did not know it until the nail pierced her heel and she fell down screaming and her brother ran to help her. Judge Sedgwick in his dissent said: "We should probably follow the rule of *caveat emptor,* which is so well established in this country. It has been a little difficult to apply this rule with exact justice in some cases, and some of the opinions seem a little extravagant in protecting reckless landlords. The rule should not be strained in favor of shrewd landlords, who are familiar with the construction of buildings and the general condition of the same, against an elderly lady who has no such knowledge and experience, and who must necessarily rely upon the good faith of the landlord." Judge Fawcett appears to have believed the same way, because he joined in Judge Sedgwick's dissent. Of course, if Mrs. Davis did not know the condition of the floor and

had no good reason to know it, then it is difficult to understand why Judges Sedgwick and Fawcett were not right in their dissent. The way to beat Mrs. Davis in her case was to exact of her the same high standard of knowledge of cause and effect that might naturally be expected of a man of wide education, broad experience, and accurate judgment. When she saw the repairs made on the kitchen floor she might have had reason to suppose that a greater or less number of the boards in the floor were rotten on the under side. That knowledge, if she had been able to reach a right conclusion concerning it, would have shown her that she was in danger if she continued to use the floor. But the *Davis v. Manning* case falls very far short of the instant case, for Mrs. Rankin had no visible thing to tell her what was wrong, and that a horrible danger was beneath her feet.

Judge Sedgwick cites *Hines v. Willcox*, 34 L. R. A. 824 (96 Tenn. 148), where it is said in the third paragraph of the syllabus: "A landlord is liable to his tenant for damages that may result from the unsafe and dangerous condition of the premises leased when that was known to, or with reasonable care and diligence might have been known to, the landlord, but not to the tenant, although the latter examined the premises and did not discover the defect."

In *Lindsey v. Leighton*, 150 Mass. 285, it was held that it was not necessary to show that the owner had actual knowledge of the defects; that his duty was that of due care, and ignorance of the defect was no defense in the absence of such care.

In 1 Pingrey, Real Property, sec. 592, it is said: "Of course, if there is a concealed defect which renders the premises dangerous which the tenant cannot discover by the exercise of reasonable diligence, of which the landlord has or ought to have knowledge, it is the landlord's duty to disclose it, and he is liable for an injury which results from his concealment of it."

If we apply the above doctrine to the instant case, the fact that the servant who fixed the threshold knew the condition that it was in, or ought to have known it because he did it, was knowledge of the landlord. If the servant knew it, the landlord knew it. The officers of a railroad company do not generally know of the negilgent acts of their employees at the time they are committed, but the railroad company is nevertheless held liable for the wrongs and injuries which their employees commit through negligence.

That Norlen notified Payne & Slater when the tenants went out, and that he took care of the keys, shows that he was assisting somewhat in the conduct of the business. He was undoubtedly helping to get tenants. He helped to get Mrs. Rankin as a tenant. She would never have moved up into his room but for the fact that he was willing that she might. If she had not found a better room than the one she occupied in the basement she might have left the premises. Norlen was an active man or he would not have been there. The man who lives in a part of my house without paying rent, and who helps take care of the house and the lawn, is my servant.

In Webster's New International Dictionary, servant is defined: "(2. Law) any person employed by another and subject in his employment to his employer's directions and control; an agent who is subject to the direction and control of his principal. *Servant* is defined in the codes of some states of the United States as 'one who is employed to render personal service to his employer, otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter, who is called his master.' (3) One who serves, or does services, voluntarily or on compulsion; a person who is employed by another for menial offices, or for other labor, and is subject to his command; a person who labors or exerts himself for the benefit of another, his master or employer; a subordinate helper."

Norlen was clearly a subordinate helper. Payne & Slater could not stay out there in the building and turn the water on and off, nor could they remain there to gather up the keys when the rooms were vacated. Norlen was quite an efficient helper so far as they were concerned. Neither of them fixed the plumbing or cut the grass and weeds. They were running a great real estate renting agency and were all the time agents of the defendant company. What the servant did in this case was towards the maintenance of the apartment in a habitable condition. That was clearly within the line of his employment. He put the threshold in to keep the cold out and to make the room habitable.

In *Younkin v. Rocheford,* 76 Neb. 531, the act done was to pick up a bucket containing oil and throw it on the fire in a brick-kiln. The man who did it had nothing to do with burning the brick-kiln. He was not there for that purpose. He was engaged solely to press brick on a table, and the oil which he used was to be used on the roller to oil the tables. He was a brick-maker, but he was not a brick-burner. He used the oil for another and different purpose than that for which he was employed, and therefore he was clearly outside of the scope of his authority. He caused a man to be dangerously burned.

In *Neff v. Brandeis,* 91 Neb. 11, it was held that, to sustain a recovery for injuries caused by being run down by an automobile owned by the defendant, the plaintiff must show by a preponderance of the evidence that the person in charge of the machine was the defendant's servant, and was at the time of the accident engaged in the master's business, or there with the master's knowledge and direction. The defendant in that case had loaned his cars to a third party, and he took it to a garage, and it was sent out by the garage in charge of their man and for the use of the borrower. The chauffeur was returning the car to the garage when he ran into a vehicle that was driven by the plaintiff, and then and there committed the injury. The garage had loaned the car without the consent of its owner.

The nail protruded. It had been driven through an elastic springy board. The nail caught and was fast down in the lower part of the board of the threshold and the floor. Because the board was springy and would work up and down over the sharp end of the nail there was danger to any one who might step upon it. When the head of the nail broke off, of course the board would come up because no longer retained in its place. When Mrs. Rankin stepped upon the board it went down because it was springy and because there was a concave space in the threshold that was directly beneath the board and which was unoccupied. This board was of soft material. It was less than an inch in thickness. It is uncontroverted that it was springy. It was probably not quite as thick as Norlen's testimony would make it. If the board was of elmwood or soft pine or basswood or any other soft wood it was not likely to be firm under the feet of any one who stepped upon it.

We are used to the idea that the railroad company must pay damages for the negligence of its servant. We are hardly accustomed to the other idea as yet that a real estate company must also pay.

Norlen was there at the request of the renting agency, Payne & Slater. The renting agency acted for the owner, but was obliged to do so through its assistants. Norlen was one of its assistants. He was the servant on the ground and in the immediate possession of the premises. Norlen could do what he did because whatever he did was done directly by permission of the renting agency which acted for the owner and which assisted the owner in taking care of the property and in renting it. In *Young v. Rohrbough,* 84 Neb. 448, it is held that where the landlord leased premises which were defective in construction, and an injury occurred because of such defect, then the landlord is liable if he knew, or under all of the circumstances ought to have known, of such defective condition. The plastering in that case fell off the walls of a room and killed a lady member of a fraternal society occupying it. The principle declared in that case has never been denied by this court.

Nor has it been changed; although the former judgment was vacated, but for another reason than that given in the first opinion. *Young v. Rohrbough,* 86 Neb. 279. The former judgment was vacated because, "Where all of the defendants are by the court's instructions placed in the same relation with respect to plaintiff, a verdict in favor of two defendants and against another, based upon conflicting evidence which is the same as to all of the defendants, will not be permitted to stand"—citing *Gerner v. Yates,* 61 Neb. 100. The original opinion should be allowed to stand, or one reaching the same conclusion. Norlen did a bad job. He was the servant of the defendant. What the real estate company did it did through him. He should have taken out the remnant of the threshold and should have built it up from the bottom. If he had done this, even though he was a poor workman, Mrs. Rankin would not have been hurt. But a carpenter should have been employed. I am not forgetful that a majority of this court voted to adopt the opinion which we published to the world as our opinion, and, in addition, one other member of the court said the conclusion was right, and all this was done after a full consideration by the whole court and after several of us had contributed our share to the opinion as it finally stood when it was voted upon. I think that the verdict of the jury settles the question in favor of the plaintiff as to how the injury was received. It also settles the question that Norlen was the servant of the defendant real estate company. There is abundant evidence to sustain the finding of the jury as to both matters. No one interfered with Norlen's duties. They were exclusively his. He lived in the room rent free. He turned the water on and off. He cut the weeds. He kept the keys and looked for tenants. He was in direct communication with the real estate agency that had charge of the renting of the house. The contention of the defendant that Norlen was not a servant would not now be made by defendant's counsel were it not with the hope of getting rid of the judgment.