## SIGISMUNDO MANCUSO AND VINCENT MANCUSO, TRADING AS MANCUSO BROTHERS, *vs.* RIDDLEMOSER COMPANY OF BALTIMORE CITY.

*Landlord and tenant; implied reservations in landlords; ways of necessity; injunction.*

Where a tenant of a large building, occupied by many others, leases, in addition to a wareroom, part of a basement where there was the only door providing ventilation and safe and convenient egress to, and access from, the boiler rooms for the machinery of the steam and electric plant, *it was held* that the doorway was one of strict and absolute necessity; and in the absence of any special terms in the contract to the contrary, there was an implied reservation to the landlord for its use.                                pp. 57-59

An injunction would lie against the tenant to prevent his closing the door or interfering with the landlord's proper use of it.                                                p. 58

As this condition was patent when the tenant leased part of the basement it was further held that the reservation by the landlord to the right to use the doorway must have been intended by the parties.                                p. 57

In such a case the mere fact that the landlord in various particulars had not complied with some of the terms of the lease, furnished no defense to the issuing of such an injunction.                                                p. 58

*Decided December 13th, 1911.*

Appeal from the Circuit Court of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, URNER and STOCKBRIDGE, JJ.

*David Ash,* for the appellant.

*Bagby & Baer* submitted a brief for the appellee.

URNER, J., delivered the opinion of the Court.

The appellee corporation is the owner of a six-story industrial building in Baltimore City, fronting on the south side of Fayette street and abutting in the rear on an alley known as Bank lane. On July 27th, 1908, the company leased to the appellants a wareroom on the first floor of the building, together with a part of the basement lying immediately north of the alley and south of a designated wall. The lease was for a term of two years. Sometime during the first year the tenants, in consideration of a reduction in the rent, surrendered to the landlord the northern half, approximately, of the basement area covered by the lease, and the new division line was indicated by a wire screen petition then constructed. On February 11th, 1910, the parties executed a new agreement for the leasing to the appellants of the room and cellar space they then occupied for the term of five years, beginning September 1st, 1910, with an option to the lessee to renew for successive terms. In each of the leases it was stipulated that the premises should be used only as a barber shop and bathing establishment and for certain incidental purposes, and there was a covenant that the landlord should supply all hot and cold water and all electric current and heat reasonably required by the tenants in the prosecution of their business. The section of basement leased to the appellants appears to have been mainly used by them for access to a toilet and for the storage of empty boxes. In the basement retained by the landlord, and partially under the wareroom tenanted by the appellants, is located the steam and electric plant by which the appellee's building is supplied with heat, light and power. There are numerous lessees who are depend-

ent upon this service.   The entire second floor is occupied by
a business college, and the floors above by various manufac-
turing industries, while the first floor accommodates several
business enterprises in additon to that conducted by the
appellants.

At the rear of the basement leased to the appellants is a
doorway five feet wide opening into Bank lane.  It is equipped
with outer doors of iron, with inner doors of glass, and with
intermediate doors of wire screen.   Until a short time before
the filing of the present bill this doorway had been used con-
tinuously by the employees of the appellee in going to and
from the steam and electric plant and in moving supplies and
repairs, and the iron and glass doors had been kept open in
order to aid ventilation and reduce the temperature.   There
were openings provided for the same purposes through the
wall and screen partition located between the plant and the
rear portion of the basement.   It appears without dispute
that the temperature of the basement, with the Bank lane
doors open, is usually about one hundred and eight degrees
in winter and sometimes as high as one hundred and forty-
five degrees in summer, and that when these doors are closed,
at any season of the year, the thermometer rises about forty
degrees.   This is shown by the evidence to be considerably
above the temperature at which the men can remain at work
and the machinery be operated with safetly.   The testimony
is that when the heat reaches one hundred and forty-five or
one hundred and fifty degrees there is danger that the wiring
and insulation on the electric generators will be destroyed.
This would necessarily cause a stoppage of the plant and of
all the machinery which it supplies with power and would
require heavy expenditures for repairs.   It is proven also
that in the event of a sudden discharge of steam, which may
result from the bursting of a pipe or the blowing out of a
gasket, the only way of escape for the employees in the base-
ment would be through the door opening on Bank lane.
There is a narrow passage leading by the boiler and fire pit
to a stairway in the front of the building, but an accident

of the character described, which has already once occurred, would cut off this means of exit.

The conditions we have indicated were existing and apparent when the appellants entered into possession under their first lease. They knew that the employees in charge of the steam and electric plant were daily using and depending upon the alley doorway for ingress and egress. They must have been aware also that the system of ventilation which the appellees had provided for the basement of their building could not be effective if the door in question were kept closed. They made no objection for nearly three years to the use of the doorway by the appellees for the purposes we have mentioned, and it was not until after this long period of acquiescence that they locked the door and asserted that its exclusive control belonged to them under their lease. They assumed this attitude for the first time early in March, 1911, and when they then closed and fastened the door the temperature of the basement rose to about one hundred and forty degrees, and according to the testimony of the engineer in charge "it absolutely got dangerous to run the machines, and it was dangerous not only to the machines but to the help, and you simply suffocated in there, and if anything were to happen you were caught like rats in a trap and couldn't get out." After this condition had existed for about two weeks the City Inspector of Buildings notified both the appellants and appellees "to keep free and open the rear exits of the heating plant in the building, as it appears they are now locked and bolted. It is a menace to the men operating the plant and must be done immediately." This was followed a few days later by the present bill for an injunction to restrain the appellants from keeping the doorway closed. A preliminary writ was granted, and upon final hearing the injunction was made perpetual.

In support of their position the appellants rely upon the fact that the lease under which they hold contains no express reservation to the appellee of any right to the use of the doorway now in dispute, and they invoke the well settled prin-

ciple that easement by *implied* reservation will not be sustained except in cases of strict necessity. *Jay* v. *Michael*, 92 Md. 210; *Burns* v. *Gallagher*, 62 Md. 472; *Mitchell* v. *Seipel*, 53 Md. 269. It is insisted that the conditions shown by the record are not such as to make the present case an exception to the general rule. The contention is that the use by the appellee of the doorway in controversy is not necessary, within the meaning of the rule stated, because it is possible that other means of access and ventilation may be provided through other portions of the basement. The evidence, however, does not support this theory. It is shown by the proof that no adequate provision could be made in substitution for the use of the opening into the alley without injuriously encroaching upon the rights of other tenants in possession of adjacent sub-divisions of the basement under prior leases. When the appellants acquired their leasehold interest, the doorway on Bank lane was the only way under the control of the appellees by which a draft of air could be obtained for the area occupied by the steam and electric plant and by which a safe exit could be secured for the engineer and fireman. This doorway was then, and thereafter continued to be, in actual and necessary use for these vitally important purposes. Under such circumstances it is clear that a reservation to the appellee of the right to such user must have been understood and intended by both the parties to the lease. In the decisions we have cited it was held that: "It is only in cases of strictest necessity, *and where it would not be reasonable to suppose that the parties intended the contrary,* that the principle of implied reservation can be invoked." In the case before us it would be altogether unreasonable to suppose that there was any intention on the part of the lessor company or of the lessees that the former should surrender the only available means of insuring the safety of the employees in charge of the plant in the basement and of obtaining the ventilation required for its satisfactory operation. In our judgment, under the conditions presented in this case, the use of the rear doorway in connection with the

steam and electric plant must be held to be one of strict and absolute necessity.

There is evidence in the record to the effect that at the time of the execution of the second lease there was a verbal agreement between the parties providing for the continued use of the doorway by the appellee. An exception to this testimony was filed upon the ground that the alleged agreement did not deal with an independent or collateral subject, but was in conflict with the lease and therefore inadmissible in evidence. The exception was overruled by the learned Court below. We do not find it necessary to review this ruling in view of the conclusion we have reached and stated as to the feature of the case we have already discussed.

The appellants made a proffer of testimony to show that the landlord had violated the terms of the lease in certain particulars. The Court below declined to receive such testimony, and in view of the nature of the issue here involved we approve of its action in this respect. It is apparent that in a case like the present, where the control of the doorway in controversy is absolutely essential to the proper performance by the appellee company of its contractual duty to the appellants and all its other tenants to supply them with heat and electric current for the purposes of their diversified enterprises, the mere fact that the appellee may not have complied in every other respect with the terms of the lease under which the appellants hold could not be regarded as a just and conclusive ground upon which to deny the relief here invoked.

The other exceptions to testimony are so numerous as to make it impracticable for us to discuss them in detail. It will be sufficient to observe that we have not based our decision upon any evidence as to which in our judgment there could be any well founded objection.

*Decree affirmed, with costs.*