63 P.(2d) 540

### HOGSETT v. HANNA.
No. 4126.

Supreme Court of New Mexico.
Nov. 19, 1936.

Rehearing Denied Jan. 9, 1937.

Hanna & Wilson and Wm. A. Brophy, all of Albuquerque, for appellant.

John F. Simms and H. O. Waggoner, both of Albuquerque, for appellee.

HUDSPETH, Justice.

This is an appeal from a judgment for $15,000 rendered in favor of plaintiff, as the administrator of the estate of Robert F. Hogsett, deceased, for the alleged negligence of the defendant and his servant resulting in the death of Dr. Hogsett.

Robert F. Hogsett, an able and well-educated physician, thirty years of age, who had a lucrative practice, died as the result of a fall from the floor of a garage through an unguarded floor door, down certain steps leading to the cellar containing a heating plant and used by a tenant of the garage as a storeroom. The defendant, appellant here, was the owner and landlord of said premises, including two offices occupied by unassociated parties. The garage was demised to William Keutter, a witness in this cause, by a written lease for the "garage located behind 217–219 West Gold Avenue, Albuquerque, New Mexico," without further description of the premises. The cause was tried to the court without the intervention of a jury. At the close of plaintiff's case the defendant moved the court to dismiss the complaint. The motion was denied and the defendant stood upon his motion, and, after saving exceptions necessary for a review, defendant took this appeal. Several points are now pressed upon our notice as calling for a reversal of the judgment.

The court made findings of fact requested by plaintiff, as follows:

"7. The heating plant for the entire building was in the basement, and prior to and at the time of the accident the Defendant, Hanna, as the landlord of the premises, furnished a servant, to-wit, a janitor, and furnished the fuel to run the furnace, and caused the janitor to use the doorway going down to the basement during the winter months when heat was necessary in the building, and neither Kuetter, the tenant of the garage, nor any other tenant of the building had any control over the firing of the furnace nor over the janitor in his trips up and down the steps and through the door leading to the basement of the building.

"8. The Defendant's servant, the janitor, left the door in the floor of the garage propped open during the season when the furnace was being run in order to increase the draft of the furnace, and prior to the 24th of November, 1933, the door in the floor of the garage had been left open for a number of days, and William Kuetter, the tenant of the garage, did not disturb it.

"9. Kuetter, the tenant of the garage, at times went into the basement where he kept some tires stored, but he exercised no control over the furnace or heating plant nor over the janitor who came and went as the servant of the Defendant."

"13. The janitor, servant of the Defendant, Hanna, was down in the basement before the accident and came out and left the door propped open, in which condition it remained until the time of the accident.

"14. There was no protective device or guard of any kind around the opening into the cellar."

The court adopted the following conclusions requested by plaintiff.

"1. The Defendant, as the owner of the garage premises, having rented the same for use as a public garage, with the knowledge that customers of the garage did come and go therein about their business, and having retained control of the operation of the furnace in the basement and the right to have his janitor go in and out of the basement through the door in the floor of the garage, owed a duty to Dr. Hogsett, as a customer of the garage, to keep the door into the basement, flush with the floor, closed, which duty he negligently failed to perform.

"2. That the negligence of the Defendant's servant, the janitor, in failing to close and keep said door closed was a proximate cause of the death of Dr. Hogsett.

"3. That the Plaintiff is entitled to judgment against the Defendant, Thomas W. Hanna, for the value of the life of Dr. Hogsett in the amount found by the Court."

At the request of defendant, the court made the following findings of fact:

"4. On the day of the accident described in the complaint, the garage was lighted with three 60 watt lights (and two 30 watt lights) hanging from the ceiling of said garage, the nearest light to the opening to the basement and hanging from the ceiling of said garage being about nineteen feet from said stairway; that there were three lights visible through three windows immediately south of said entrance to the basement, said windows through which the lights were visible being just above said basement opening and within two feet thereof; that at the time of the accident it was light around said entrance to the basement, and as light there as in any other part of the garage.

"5. That a few minutes prior to the time the deceased was found on the basement steps by William Kuetter, said deceased had stood in front of his car which was parked by the side of said stairway, and looked at the car and talked to his secretary, Miss Gibson, about the way the car had been polished; that said deceased had been in the garage taking his car in and out every day except Sundays for a period of six or eight months prior to the accident; that a few minutes before the accident and when last seen by William Kuetter, the deceased was walking sideways toward his car and toward the entrance to said basement; that deceased's car had been parked near the basement stairway before this time."

"7. That the tenant, William Kuetter, was down in the basement some time during the day of the accident, and the last time he went down into the basement and came up he left the door open. The evidence does not disclose whether any person was down in the basement after said tenant Kuetter left the door open and prior to the accident."

"10. On one occasion the defendant, Thomas W. Hanna, requested the tenant William Kuetter not to park cars on top of the door going into the basement so that the janitor could have access to the basement. During the winter months, except for a period of time during which the tenant kept all of the doors locked so that no one could have access to the garage room, extending over some period of time, the tenant, William Kuetter, left a door to the garage unlocked, and also kept his cars off of the door so that the door could be opened. That the tenant, William Kuetter, used the stairway going into the basement and kept certain supplies and tires stored in the basement for his use in connection with the operation of the garage."

"13. That there was a coal chute outside of the garage occupied by said Kuetter, through which a janitor could enter the basement and have access to the furnace therein without using the basement steps in said garage room, and that said outside coal chute was used on occasions by the janitor (for that purpose when he had been locked out of the garage)."

And the court adopted the following conclusions of law at the request of defendant:

"2. Under the terms of the written lease between the defendant Hanna and the tenant Kuetter, the tenant Kuetter had the right to the exclusive control and possession of the entire premises including the door over the steps leading into the basement, and that said defendant Hanna had no right or privilege under said lease to enter said premises to repair or rehabilitate same or to change any of the structures in said premises without the consent of William Kuetter."

"11. The evidence does not show any pecuniary damage to the father or mother of the deceased, they being the ones shown by the evidence to be entitled to the distribution of the proceeds of any judgment obtained on account of the death of Deceased."

The parties will be referred to as in the trial court. The defendant maintains that the trial court erred in ruling that an individual master was liable for the wrongful death caused by the tort of his servant, and cites the case of Don Yan v. Ah You, 4 Ariz. 109, 77 P. 618, and Texas cases. Neither the Arizona nor Texas statute is identical with the New Mexico act.

Our statute was originally passed as chapter 61 of the Laws of 1882 and was taken from the statutes of Missouri. Prior to the enactment of this statute by our Territorial Legislature, the case of Proctor v. Hannibal & St. J. Railway Company, 64 Mo. 112, had been decided by the court of last resort of that state. The court in that case said: "It manifestly appears from these provisions—for they apply to the injuries alluded to in section 3, as well as to those in section 2—that it must have been in the mind and intention of the legislature only to confer upon the above classes of persons the right to sue in cases where the husband, wife or child could have sued, had not death been the result of the injury."

The statute was again construed in Gray v. McDonald, 104 Mo. 303, 16 S.W. 398, 399, where it is stated: "It is next insisted by the appellant that this action is founded on section 2122 of the Revised Statutes of 1879, being the third section of the damage act; that by that section the person only who committed the act of homicide is liable in damages to the designated survivor of the deceased, and hence a demurrer to the evidence should have been sustained. The first branch of the proposition is conceded; but we do not agree to the second, in the sense in which it is pressed by appellant. The statute declares: 'Whenever the death of a person shall be caused by a wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the injured party to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.' This section, like the preceding one, does not, as is often supposed, create a new cause of action. It transmits to the designated persons a cause of action when the injured person would have had one had death not ensued. In other words, the cause of action does not abate by reason of the death of the person injured. Proctor v. Railroad Co., 64 Mo. 112; White v. Maxcy, 64 Mo. 552. The first inquiry, therefore, is whether the injured party would have had a cause of action against the defendant for the wrongful act causing death, had death not ensued. Crumpley v. Railway Co., 98 Mo. [34] 36, 11 S.W. 244. If the injured party would have had a common-law or statutory cause of action, had death not ensued, then the cause of action survives to the designated person."

And in the case of Casey et al. v. St. Louis Transit Co., 205 Mo. 721, 103 S.W. 1146, the court said: "These are purely statutory rights of action, and each must rest on its own statute. They may be joined in the same petition, but, when so, they should be stated in separate counts. The right of action given in section 2864 [Mo.St.Ann. § 3262, p. 3353] is for a death caused by the negligence of the servant operating the defendant's instrument of transportation, whether it be a locomotive, car, train of cars, steamboat, its machinery, stagecoach, or other public conveyance, while the right of action given in the two sections next following is for a death caused by the negligence of the defendant, which may mean his own negligence, as, for instance, in furnishing an unsafe vehicle, or it may mean his negligence through his servant in some particular other than the particular specified in section 2864, for which, if the person injured had not died, he would have had a right of action."

While the last two cases cited above were decided after the enactment of the statute by our Territorial Legislature, they appear to us to be sound. The determinative fact is whether or not Dr. Hogsett, if he had survived, could have maintained an action against the defendant for injuries

received. This proposition is not disputed. This point is ruled against the defendant.

The defendant strenuously urges that, since the court concluded that plaintiff had failed to prove any pecuniary damages to the father and mother of the deceased, they being the ones shown by the evidence to be entitled to the distribution of the proceeds of any judgment obtained on account of the death of the deceased, the court erred in rendering judgment for $15,000 against the defendant. This is one of the principal questions discussed in the case. This court had this question under consideration in Valdez, Administrator, v. Azar Bros., 33 N.M. 230, 264 P. 962, and Mr. Justice Watson prepared an able opinion covering this question. The case went off on another point and the opinion was withdrawn. In the course of that opinion, Mr. Justice Watson said:

"Appellee's intestate was eight years of age. Beneficiaries of the judgment are, under section 1823, Code of 1915, sisters and a brother, aged, respectively, fourteen, thirteen and six years. The evidence of pecuniary loss to these beneficiaries, if not wholly lacking, is very slight. This follows naturally from the ages and situation of the parties. Appellants contend that in the absence of actual proof of pecuniary loss only nominal damages are recoverable. They insist that where judgment is sought for the benefit of collateral kindred, no presumption of pecuniary loss may be indulged. They admit that to sustain their contention we must overrule Cerrillos C. R. Co. v. Deserant, 9 N.M. 49 [49 P. 807], but they urge that the rule there laid down is clearly wrong. In that case it was established as the measure of damages 'that from the proof as to age, earning capacity, health, habits and probable duration of life, the jury shall say what is the present worth of the life of deceased.' If this is the correct rule of damages, it is not questioned that the evidence supports the judgment.

"In considering the authorities on this question, the great divergence in and variety of statutory provisions must be kept in mind. As stated in Sutherland on Damages, § 1261:

" 'The most noticeable difference and the one which affects greatly the elements of damage is that between statutes which provide that the damages shall be distributed to the widow, husband and near of kin of the deceased, and those which provide that they shall be part of his estate. Under the former, the beneficiaries may recover the amount of loss resulting to them from the death; under the latter no such inquiries are relevant, but the question is how much has his estate suffered by his death?' See, also, Sedgwick on Damages, § 571B.

"This distinction is evidently logical, and we presume, upon the authority of the eminent author quoted, that it is generally to be observed in comparing statutes of the various jurisdictions. If we can place our statute in the one or the other of these categories, the problem will be solved.

"Sections 1821 and 1823, Code of 1915, which are here to be construed and applied, are as follows:

" 'Section 1821. Whenever the death of a person shall be caused by the wrongful

act, neglect or default of another, although such death shall have been caused under such circumstances as amount in law to a felony, and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.'

" 'Section 1823. Every such action as mentioned in section 1821 shall be brought by and in the name or names of the personal representative or representatives of such deceased person, and the jury in every such action may give such damages, compensatory and exemplary, as they shall deem fair and just, taking into consideration the pecuniary injury or injuries resulting from such death to the surviving party or parties entitled to the judgment, or any interest therein, recovered in such action, and also having regard to the mitigating or aggravating circumstances attending such wrongful act, neglect or default. The proceeds of any judgment obtained in any such action shall not be liable for any debt of the deceased: Provided, He or she shall have left a husband, wife, child, father, mother, brother, sister, or child or children of the deceased child, but shall be distributed as follows:

" 'First. If there be a surviving husband or wife, and no child, then to such husband or wife; if there be a surviving husband or wife and a child or children or grand-children, then equally to each, the grandchild or grandchildren taking by right of representation; if there be no husband or wife, but a child or children, or grandchild or grandchildren, then to such child or children and grandchild or grandchildren by right of representation; if there be no child or grandchild, then to a surviving brother or sister, or brothers or sisters, if there be any; if there be none of the kindred hereinbefore named, then the proceeds of such judgment shall be disposed of in the manner authorized by law for the disposition of the personal property of deceased persons.'

"Counsel calls attention to the provision that 'the jury * * * may give such damages, compensatory and exemplary, as they shall deem fair, and just, taking into consideration the pecuniary injury or loss resulting from such death to the surviving party or parties entitled to the judgment.' The surviving party or parties entitled to the judgment are the kindred mentioned later in the section to whom the proceeds of the judgment are to be distributed. Standing alone, such provision would seem to place our statute in the class limiting the damages to those compensatory of the pecuniary loss shown. Counsel relies mainly on this provision, and contends that it was not given sufficient weight in the formulation of the rule in Cerrillos C. R. Co. v. Deserant, supra.

"There are other provisions, however, which must not be overlooked. The right of action is not dependent nor conditioned upon the survival of any kindred. Section 1821 gives a cause of action against the

culpable party 'in every such case.' Section 1823 provides for the bringing of suit by the personal representative, and provides for the distribution of proceeds of the judgment to the designated kindred; not in the proportions that the jury may have found them to have suffered pecuniary loss, but according to an arbitrary priority. Thus the law seems to presume loss to these sisters and brother in the case at bar, even though the evidence might have disclosed that it was the parents who really suffered. The proceeds of the judgment are liable for decedent's debts only in case there are no kindred of the favored classes. If there be none of the kindred named, then the proceeds are to be disposed of under the laws of distribution. Our statute was under consideration in Whitmer v. El Paso & Southwestern Co., 201 F. 193, where the Circuit Court of Appeals of the Fifth Circuit said:

" 'The statutes allowing damages for wrongful act or neglect causing death have for their purpose more than compensation. It is intended by them, also, to promote safety of life and limb, by making negligence that causes death costly to the wrongdoer.'

"If the legislature intended no more than to compensate those of the surviving kindred who had suffered pecuniary loss, the statute is illdesigned for that purpose. It does not provide for a finding by the jury as to which of the kindred have suffered loss, nor in what proportions. It does not provide for distribution of the proceeds of the judgment in proportion to the losses suffered, but, arbitrarily, according to kinship. In such a case as that at bar the loss shown to have been suffered by one only of the three beneficiaries, and which the jury is directed to take into consideration in assessing damages, would inure to the benefit of the other two, in the equal distribution of the proceeds of the judgment.

"On the other hand, the direction that the jury take into consideration the pecuniary injury to the party or parties entitled to the judgment raises a question as to whether the legislature intended to compensate only for the injury to the decedent's estate. It clearly does not contemplate compensation to the 'estate' in the usual sense, because debts, which ordinarily have priority of claim against an estate, are, by this statute, not to participate in the distribution, except in the absence of kindred of the favored classes. If the compensation is for injury to the estate, it must be a special 'estate' which it is the legislative policy to distribute in a special manner.

"A careful reading of the sections under consideration suggests that the first thought of the legislature was to create a cause of action against a culpable party. It gave secondary consideration to the distribution of the proceeds of the judgment. It did not intend to relieve the tort feasor from liability in any event. While its first care was to provide for those whom it presumed to have suffered pecuniary loss, it contemplated the payment of the decedent's debts in the absence of kindred presumably damaged, and a distribution of the residue to other kindred. The statute clearly contemplates a re-

covery even if there be no surviving kindred of the favored classes. In such a case appellants' theory that the damages are only to be compensatory of pecuniary loss must fail. It is not to be supposed that the legislature solemnly provided for a payment of debts and a further distribution to kindred from nominal damages only. We should be slow to hold, either,

that in a case where there were no kindred of the relationships mentioned in the statute, the administrator could show the amount of outstanding debts of the decedent, as a matter to be considered in the assessment of damages. We could hardly hold that a judgment to be recovered for the benefit of surviving brothers and sisters could be only nominal in amount, because of the impossibility of showing pecuniary loss, and, at the same time, hold that substantial damages might have been recovered ·if there had been no kindred. The law expressly prefers brothers and sisters to creditors. This preference must have been created, either upon a presumption of pecuniary loss, or because they, in their order of priority, were deemed the proper objects of a gratuity made possible by a penalty imposed, as matter of policy, upon the party whose act caused the death of the decedent. If the legislative theory was a presumption of pecuniary loss, that presumption supplies the lack of actual proof. If a gratuity, pecuniary loss is not a requisite. On either theory, substantial damages are recoverable, according to some measure, without actual proof of loss.

"These considerations lead us to conclude that our statute resembles rather those which provide for compensation to the estate than those which provide compensation for pecuniary loss to named kindred. It was these considerations, no doubt, and perhaps others, which impelled the territorial supreme court in Cerrillos C. R. Co. v. Deserant, supra, to establish as the measure of damages in all cases of death by wrongful act, 'the present worth of the life of deceased.' That pronouncement has stood for many years as the law of this jurisdiction. For that reason alone it should not be departed from except for weighty reasons. The people and their legislatures have long acquiesced in the construction there placed upon this statute, though they might at any time have changed it. The case does not require us to examine the question further. We have only to determine the validity of appellants' contention that the evidence warranted only nominal damages. This contention we must overrule, without speculation at this time as to the effect, in some other case, of the provision that the jury should consider the pecuniary injury to the party entitled to the judgment. In reaching the present conclusion, we are not without direct authority. In Whitmer v. El Paso & S. W. Co., supra, the court had under consideration the same statute and a similar case."

Defendant's able counsel have cited many cases from other jurisdictions interpreting statutes somewhat similar to ours which support their position. However, we do not feel justified in reversing the

case of Cerrillos C. R. Co. v. Deserant, supra, for the reasons so clearly stated by Mr. Justice Watson. The evidence of the worth of the life of the deceased is substantial and the entry of judgment with the findings made meet the requirements of Comp.St.1929, § 105-813.

The defense of contributory negligence is pressed upon us as a ground for reversal of the judgment. The defendant maintains that the deceased was plainly guilty of negligence, that the obligation rested upon him to exercise reasonable care for his own safety, that the stairway constituted no reasonable source of danger to any one familiar with the premises who took proper precautions to see where he was stepping and that one must accept the consequences of his own precipitation, and cites Hilsenbeck v. Guhring, 131 N.Y. 674, 30 N.E. 580; Leech v. Atlantic Delicatessen Co., 104 N.J.Law, 381, 140 A. 423; Micca v. Parentini, 150 A. 223, 8 N.J.Misc. 332; Gleason v. Boehm, 58 N.J.Law, 475, 34 A. 886, 32 L.R.A. 645; Silver v. Hause, 285 Pa. 166, 131 A. 668; Reynolds v. Los Angeles Gas & Electric Co., 162 Cal. 327, 122 P. 962, 39 L.R.A.(N.S.) 896, and note, Ann.Cas.1913D, 34; Solomon v. Finer, 115 N.J.Law, 404, 180 A. 567; Hammer v. Liberty Baking Co., 220 Iowa, 229, 260 N.W. 720; Larned v. Vanderlinde, 165 Mich. 464, 131 N.W. 165; Swanson v. Peter Schoenhofen Brewing Co., 215 Ill.App. 185. The deceased is presumed to have exercised due care. This presumption might be rebutted by circumstantial evidence, and is a question for the trier of facts to determine whether all the facts

and circumstances rebutted that presumption. The burden in this state of showing contributory negligence is on the defendant, De Padilla v. Atchison, T. & S. F. Railway Co., 16 N.M. 576, 120 P. 724, 729. In that case the rule was laid down that: "When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the fact is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the courts." The case was followed in Russell v. Davis, 38 N.M. 533, 37 P.(2d) 536; Crespin v. Albuquerque Gas & Electric Co., 39 N.M. 473, 50 P.(2d) 259.

The findings of fact have been quoted above, and it is not necessary to repeat them here or discuss the evidence, since the findings are supported by substantial evidence. We cannot say as a matter of law that the trial court erred in refusing to find that the deceased was guilty of contributory negligence, or that the open stairway was not a dangerous place.

The defendant maintained that there is a fatal variance between the complaint and the evidence, but we find no merit in this point.

Another point upon which defendant relies for reversal is: "The plaintiff failed to prove any violation of duty by the defendant unto the deceased or to the plaintiff which was the approximate

cause of the death of Robert F. Hogsett or injuries, if any, to the plaintiff." The negligence of the defendant according to the complaint consisted of (1) failure to furnish sufficient light; (2) failure to guard the opening to the basement; (3) he suffered and permitted the door or covering over the entrance to the basement to stand open. There was no evidence that the defendant had personal knowledge that the door was allowed to stand open.

The defendant, relying upon the construction of the written lease under which the tenant held, has cited many authorities on the assumption that the facts show the tenant in possession of the floor of the garage under an ordinary tenancy for a period of years. The law applicable to such state of facts is clearly stated in the case of Roberts v. Rogers, 129 Neb. 298, 261 N.W. 354, 356, as follows:

"In the absence of express contract to the contrary, a tenant takes demised premises as he finds them, and there is no implied warranty by the landlord that they are safe or fit for occupancy. The rule of caveat emptor applies. 16 R.L.C. 777, § 271; 36 C.J. 204; Hatzis v. United States Fuel Co., 82 Utah, 38, 21 P.(2d) 862; Miller v. Vance Lumber Co., 167 Wash. 348, 9 P.(2d) 351; Gray v. Pearline, 328 Mo. 1192, 43 S.W.(2d) 802; Davis v. Manning, 98 Neb. 707, 154 N.W. 239; Rankin v. Kountze Real Estate Co., 101 Neb. 174, 162 N.W. 531.

"In the absence of contract, no duty to repair leased premises devolves upon the landlord, but, on the contrary, the relation of landlord and tenant devolves that duty upon the tenant. Whitehead v. Comstock & Co., 25 R.I. 423, 56 A. 446; 16 R.C.L. 1030, § 552.

"A landlord is under no duty to change the visible form and mode of construction of leased premises in order to make the premises safe for his tenant, nor is he bound to remove obvious sources of danger; as to these the tenant assumes the risk. Andrews v. Williamson, 193 Mass. 92, 78 N.E. 737, 118 Am.St.Rep. 452; Miller v. Hooper, 119 Me. 527, 112 A. 256.

"A landlord is not liable to his tenant for any defects existing in the demised premises at the time of the lease that are perceptible to the senses or that can be discovered by reasonable inspection or examination. Doyle v. Union Pac. R. Co., 147 U.S. 413, 13 S.Ct. 333, 37 L.Ed. 223; Keates v. Earl of Cadogan, 10 C.B.(Eng.) 591; Woods v. Naumkeag Steam Cotton Co., 134 Mass. 357, 45 Am.Rep. 344; Berlin v. Wall, 122 Va. 425, 95 S.E. 394, L.R.A.1918D, 161; Hines v. Willcox, 96 Tenn. 148, 33 S.W. 914, 34 L.R.A. 824, 832, 54 Am.St.Rep. 823; Booth v. Merriam, 155 Mass. 521, 30 N.E. 85; Bowe v. Hunking, 135 Mass. 380, 46 Am.Rep. 471. * * *

"As indicated by the foregoing excerpts, the evidence in the record, as an entirety, discloses that, so far as defects alleged in the petition were concerned, the dangerous condition actually inhered in the construction of the trapdoor, and became such as and when subjected to the natural law of gravitation. * * *

"The controlling principle in this case appears to be the following: A landlord is ordinarily under no duty to change the visible form and mode of simple construction of leased premises in order to make the premises safe for his tenant, nor is he bound to remove obvious sources of danger; as to these the tenant assumes the risk."

See, also, Dammeyer v. Vorhis, 63 Ind.App. 427, 113 N.E. 764; Lawler v. Capital City L. Ins. Co., 62 App.D.C. 391, 68 F.(2d) 438, and cases therein cited.

There are cases holding that the landlord is liable where he leases land which contains a nuisance whether he is in possession or not. Many of these cases are cited in 50 L.R.A.(N.S.) 288. The same rule is stated in 16 R.L.C. 1076, as follows: "No person can create or maintain a nuisance upon his premises and escape liability for the injury occasioned by it to third persons. Nor can a lessor so create a nuisance and then escape liability for the consequences by leasing the premises to a tenant."

But this law has no application to the case at bar, since the trial court properly held that the entrance to the basement did not constitute a nuisance. We have no statute inhibiting the mode of construction followed, and there are many buildings in the state with like unguarded entrances to basements. The trial court also found that the cover to the entrance to the basement was a sufficient cover and not defective in any way. Nor does the case under consideration fall within the class of those where the party injured has no connection with the tenant. In Mahnken v. Gillespie, 329 Mo. 51, 43 S.W.(2d) 797, 802, the court said: "In this case, the walk in question, including the covering to the well, was in no sense a public walk provided for the use of the public in general, and which all who desired were invited to use. It was at most a private walk on private property for the benefit of the occupants of the premises and their families, servants, guests, and invitees. Cases such as St. Gemme v. Osterhaus, 220 Mo.App. 863, 294 S.W. 1022, cited by plaintiffs, and dealing with the liability of landowners or tenants who maintain pitfalls or obstructions in sidewalks or other public ways, or so near thereto as to endanger users thereof, are not applicable. Meade v. Montrose, 173 Mo.App. 722, 725, 160 S.W. 11; Bender v. Weber, 250 Mo. 551, 561, 157 S.W. 570, 573, 46 L.R.A.(N.S.) 121."

In the case of Lucas v. Brown (C.C.A.) 82 F.(2d) 361, 362, it is stated: "The trial court thought the case governed by Davis v. Manning, 98 Neb. 707, 154 N.W. 239, and the decisions of this court in Midland Oil Co. v. Thigpen, 4 F.(2d) 85, 53 A.L.R. 311, and Fraser v. Kruger et al., 298 F. 693. We adhere to the rules announced in these cases, to wit, that ordinarily the duties and liabilities of a landlord to persons on leased premises by invitation of the tenant are the same as those owed to the tenant himself; that a subtenant, servant, employee, guest, or invitee of the tenant is so identified with the tenant himself that his right of recovery for

injury as against the landlord is the same as that of the tenant, if he suffers injury; that, where there is no agreement by the landlord to repair, and he is not guilty of any fraud or concealment, by failing to disclose hidden defects of which he has knowledge, a tenant, to whom the defects, if any, are as patent as to the lessor, takes the risk of safe occupancy, and the landlord is not liable to the tenant nor to his invitees for personal injuries sustained."

So the point based upon the mode of construction may be eliminated.

The plaintiff maintains that under the evidence and findings the defendant had control of the door leading to the basement and the basement, and he cites 25 A.L.R. 1273: "To the rule that a tenant takes the leased premises subject to defects not amounting to a trap, there is an exception to the effect that the owner of a building who leases it to different tenants, and expressly or impliedly reserves portions thereof, such as halls, stairways, porches, walks, etc., for the use in common of different tenants, is liable for any personal injury to a tenant, or a person in privity with a tenant, due to defects in the portion of the leased premises of which the landlord so retains control, provided the defect is ascribable to the negligence of the landlord, and the tenant or person injured is not guilty of contributory negligence."

Under this annotation and supplemental annotations in 39 A.L.R. 294, 58 A.L.R. 1411, 75 A.L.R. 154, 97 A.L.R. 220, there are hundreds of cases cited and the soundness of the doctrine cannot be questioned.

However, its application to the case at bar depends upon whether or not the defendant "expressly or impliedly reserved * * * portions of the leased premises of which the landlord so retains control." The findings do not clearly cover this point. It is not determined whether the defendant used the entrance under an implied reservation of the right to enter the basement through the door forming part of the garage floor when closed or whether the written lease contract was modified at the time defendant made the request referred to in defendant's finding No. 10 quoted above.

Plaintiff cites Mancuso et al. v. Riddlemoser Co., 117 Md. 53, 82 A. 1051, Ann.Cas.1914A, 84, where it was held that, when the tenant rented the premises, he knew that the door was necessary for proper ventilation as well as a passageway for the employees of the landlord, and decided that the easement existed, although adhering to the well-settled principle that easement, by implied reservation, will not be sustained except in cases of strict necessity.

The defendant points out that this entrance to the basement was not in a hallway or along a usual and customary passageway, but formed a part of the floor of a room some 60′ by 60′ used as a garage; that, so far as the record shows, the tenant was the last person to pass through the doorway leading to the basement; and that the only testimony as to the use of the door for ventilation is that of the janitor, who testified that he left the door propped open 18″ in the daytime

in aid of the furnace draft and closed it at night.

The only other testimony touching on this point was that of the tenant, Kuetter, who testified as follows:

"Q. How often did the janitor come and go through that doorway? A. I presume from four to eight times a day.

"Q. How often did you go into the basement? A. I judge three or four times a day.

"Q. And through this door? A. Yes. * * *

"Q. Did you leave this door open, on the evening of the 24th of November, 1933, at which time Dr. Hogsett fell in it? A. Yes.

"Q. Did you leave it open? A. It was left open, I didn't leave it open; I had been down in the basement during the day but I didn't open it, consequently I didn't shut it.

"Q. You found it open and you went down and came back and left it open? A. Yes.

"Q. Do you know who opened it and propped it open? A. I believe the janitor did.

"Q. That was Pedro Urioste? A. Yes.

"Q. Did the janitor customarily leave that door open? A. Yes.

"Q. Every .day? A. Yes, during the time they fired the furnace; that would be the winter months of the year.

"Q. Do you know why he left it open? A. Outside of being more convenient, I guess that was all.

"Q. Don't you know as a matter of fact he left it open for draft?

"Mr. Wilson: Object to his leading the witness.

"The Court: Objection sustained.

"Q. You know of no other reason than that it was just convenient for the janitor that he left it open? A. That was it.

"Q. On the day in question it was the janitor, not you, that left this door open? A. It was the janitor.

"Q. It had been open for several days constantly, hadn't it? A. Possibly longer than that."

The defendant contends, not without reason, that the tenant left the door to the basement open in order to save his own time and effort and not in the interest of defendant—that according to plaintiff's theory the door was required to be open only eighteen inches in order to supply the draft for the furnace, and that the undisputed fact is that there would have been only a few inches between the running board of the deceased's car and the edge of the door covering the entrance to the basement if it had been propped open at that angle. The defendant maintains that he owed no duty to the deceased beyond that owed to the tenant as landlord. This is true only in case the tenant had control.

In the case of Altemus v. Talmadge, 61 App.D.C. 148, 58 F.(2d) 874, 876, it is stated:

"The next assignment (confined to the appellant Altemus) is to the point that the tenant and not the owner is liable. * * *

"The fact that it was also essential in the practicable use of the leased premises

did not of itself, and without something more, shift the responsibility of maintaining it in good order from the owner to the tenant, and this is true, if for no other reason, because the principle of implied responsibility on the part of the tenant grows out of exclusive possession, and, where that is lacking, the implication falls."

See, also, Lawler v. Capital City L. Ins. Co., supra.

We find both the tenant and defendant using the basement. Whether the basement was an appurtenance of the garage is nowhere shown. The vital question seems to be whether the defendant or tenant had control of the door covering the entrance to the basement, which, when closed, formed a part of the garage floor. This is a question of fact. Randall v. First National Bank, 102 Neb. 475, 167 N.W. 564; Bellon v. Silver Gate Theatres, 4 Cal.(2d) 1, 47 P.(2d) 462, 468; 36 C.J. 254.

■ In the Silver Gate Theatres Case, the Supreme Court of California commented interestingly on a rule prevailing in this state, Trigg v. Trigg, 37 N.M. 296, 22 P. (2d) 119, as follows: "We think enough of the evidence has been summarized to indicate that, although the question is a close one, there is substantial evidence to sustain the implied finding of the jury that the basement did not pass under the lease. Under such circumstances, we are without power to disturb the verdict. As was said in Crawford v. Southern Pacific Company [3 Cal.(2d) 427] 45 P.(2d) 183, 184: 'In reviewing the evidence on such an appeal, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked, principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' "

This question is also a close one. On the one hand, the defendant can be held liable only on the theory that he had control of the doorway leading to the basement. Starr v. Sperry, 184 Iowa, 540, 167 N.W. 531. On the other hand, the learned trial judge found that the negligence of the defendant was the approximate cause of the death of Dr. Hogsett.

■ The defendant's motion to strike the complaint is in effect a demurrer to the evidence, and admits the truth of the testimony, and every reasonable inference which may be drawn from the evidence. Morrison v. First National Bank, 28 N.M. 129, 207 P. 62. We are unable to say that the trial court's inferences are unreasonable or without support. For the reasons stated, the judgment should be affirmed, and it is so ordered.

SADLER, C. J., and BICKLEY and BRICE, JJ., concur.

ZINN, J., did not participate.